UNITED STATES of America, Plaintiff-Appellee,

v.

William ROSE and Robert Peterson, Defendants-Appellants.

No. 78–1331.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 31, 1978.

Decided Dec. 20, 1978.

Rehearing Denied Feb. 23, 1979.

John W. Conniff, Chicago, Ill., for defendants-appellants.

Gary S. Shapiro, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before PELL and TONE, Circuit Judges, and WHELAN, Senior District Judge.*

TONE, Circuit Judge.

The principal issue before us is whether the defendants can be found guilty of a conspiracy under 18 U.S.C. § 371[1] to transport in interstate commerce goods valued at $5,000 or more, knowing the goods to be stolen, in violation of 18 U.S.C. § 2314,[2] when no goods were ever stolen because the defendants unwittingly engaged agents of the government to perform the actual theft and transportation. We answer the question in the affirmative and affirm the convictions.

One James Srbinovich, while in the McHenry County Jail in Woodstock, Illinois, met with two Special Agents of the Drug Enforcement Administration. In the presence of the agents, Srbinovich placed a telephone call to defendant William Rose, whom Srbinovich had known for 15 or 20 years. In the conversation Srbinovich stated that he was in Albuquerque. Rose said, "I want to talk to you right away. I have got something for you." Asked, "What is that?," Rose said, "Well, you went on it once before." (Srbinovich had met with both defendants a year earlier at Rose's

---

* The Honorable Francis C. Whelan, Senior District Judge of the United States District Court for the Central District of California, is sitting by designation.

1.  18 U.S.C. § 371 reads in relevant part,
    If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

2.  18 U.S.C. § 2314 reads in relevant part,
    Whoever transports in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud; . . . Shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

apartment to discuss the commission of a burglary in Arizona.) Srbinovich said he was broke. Rose replied that he would wire him $500 "because this thing has to go over the weekend." Rose later wired $500 to Albuquerque addressed to Srbinovich, which government agents collected.

The telephone conversation was proved at trial by the testimony of Srbinovich and one of the DEA agents who was with Srbinovich. Although the agents monitored and recorded the conversation on tape with Srbinovich's permission, the recording was not presented at trial because the government represented to the court that it had lost the tape.

Three days after the telephone conversation, Srbinovich met with Rose in Chicago, at which time they discussed a burglary to be committed in Scottsdale, Arizona. Rose stated that Srbinovich, and a partner Srbinovich was to find, would receive two-thirds of the take. Rose and the "tipster" in Arizona would split the remaining third between themselves. Rose described the valuables to be taken, which he estimated were worth approximately $200,000.

A few days later Srbinovich went to Rose's apartment in Chicago with DEA Agent Skaggs, who posed as Srbinovich's partner, to receive instructions. Rose told them to go to Scottsdale and meet with "Bob," who would give them the layout of the house and further instructions. Rose also instructed them to return to Chicago with the stolen goods because Bob was the real estate agent who had sold the house to the intended victim, and thus would be an obvious suspect. Rose informed them that he knew of a person who would come to Chicago to purchase the goods. Finally, Rose told them to get everything, because he had been planning this for a long time.

Two days later Srbinovich and Skaggs went to Scottsdale and checked into a motel. The next day Srbinovich called Rose to give him their phone number and location. Rose told them he would relay the information to Bob, who would contact them. When Rose could not reach Bob, he called Srbinovich and gave him Bob's number.

Srbinovich finally reached Bob at that number, and they made plans to meet at the motel that evening.

Srbinovich and Skaggs met that evening with Bob, who turned out to be defendant Robert Peterson. In the ensuing conversation Peterson described the house and surrounding area, the burglar alarm system, and the valuables they planned to steal. He estimated the combined value of only two of the many pieces, a necklace and a ring, at $100,000.

During the next two days, Peterson met with Srbinovich and Skaggs several more times to discuss details of the plan, and drove them out to the house to look it over. At one point, Peterson stated that Srbinovich and Skaggs had to take the goods out of the state.

On the day Srbinovich and Skaggs were to commit the burglary, FBI agents took photographs of various pieces of jewelry and art in the house. Later that day, Srbinovich called Peterson and Rose to tell them that he had successfully committed the burglary. The next day Srbinovich and Skaggs returned to Chicago with the FBI photographs, which they showed to Rose. They arranged to meet later to divide up the goods, but when they did meet they could not agree as to the amount of payment. Two days later Skaggs contacted Rose and agreed to his price, $10,000. They met that afternoon, and, when Rose stated that he had the money and was ready to proceed with the transaction, he was arrested. Peterson was subsequently arrested in Arizona.

The events we have described were proved primarily by the testimony of Srbinovich and Skaggs. Neither defendant testified in the trial before a jury, in which both were found guilty of the offense of conspiracy to violate 18 U.S.C. § 2314.

## I.

Concededly, Srbinovich and Skaggs never intended to steal valuables and transport them in interstate commerce, and there were no stolen goods. On these facts de-

fendants base several arguments for acquittal.

### A.

First, it is argued that Srbinovich and Skaggs, who merely feigned participation, were necessary parties to the conspiracy. It takes only two to conspire, however, and the evidence showed a conspiracy between the two defendants to burglarize the house in Arizona and transport the goods in interstate commerce. That their plan was doomed because they unwittingly chose as their instrumentalities agents of the government is irrelevant to the existence of the conspiracy.

Neither *United States v. Chase,* 372 F.2d 453 (4th Cir. 1967), nor *Sears v. United States,* 343 F.2d 139 (5th Cir. 1965), relied on by defendants, is to the contrary. *Chase* merely held that no conspiracy could exist between a single defendant and a government agent, and *Sears* did not reach the issue. *O'Brien v. United States,* 51 F.2d 674 (7th Cir. 1931), and *United States v. Wray,* 8 F.2d 429 (N.D.Ga.1925), also cited by defendants, are entrapment cases and therefore irrelevant, since defendants do not argue entrapment. Finally, defendants also cite *Developments in the Law—Criminal Conspiracy,* 72 Harv.L.Rev. 920 (1959), for the proposition that no agreement exists if a necessary party feigns acquiescence, but their argument is defeated by a footnote in the article itself:

> The fact that one person's agreement is feigned should not prevent a conspiracy conviction when there are at least *t*wo others involved whose mutual adherence to the common plan is genuine.

*Id.* at 926, 927 n.35.

Also without merit is defendants' related argument that the government failed to satisfy the overt act requirement because each act involved some communication with government agents and therefore did not actually further the conspiracy. The words "any act to effect the object of the conspiracy" in § 371 require only that the act be intended to have the described effect, not that it actually succeed. *Collier v. United States,* 255 F. 328, 329 (5th Cir. 1918); *United States v. Root,* 366 F.2d 377, 383 (9th Cir. 1966); *see also Hall v. United States,* 109 F.2d 976, 984 (10th Cir. 1940); *cf. Jung Quey v. United States,* 222 F. 766, 771–772 (9th Cir. 1915).

### B.

Defendants' second argument is that there could be no conspiracy to violate § 2314 because in the absence of any stolen goods an essential element of the substantive crime, *viz.,* that the defendants know the goods to be stolen, could not exist. Essentially, the argument is that a conspiracy to violate § 2314 cannot exist unless and until someone has stolen the goods the conspirators plan to transport in interstate commerce.

Plausible as this argument may seem at first, it ignores the nature of the crime of conspiracy, which is an agreement to commit a substantive crime, accompanied by an overt act in furtherance of the agreement. Whether the substantive crime itself is, or is likely to be, committed is irrelevant. Thus, although § 2314 cannot be violated unless there are in fact stolen goods, a conspiracy to violate that section occurs when two or more persons agree to attempt to commit acts which include all the elements of a crime under that section and any overt act is done pursuant to the agreement. Here Rose and Peterson intended to cause the goods to be stolen and then transported in interstate commerce with knowledge that they had been stolen. All that was necessary, in addition to an overt act, was that the intended future conduct they had agreed upon include all the elements of the substantive crime.

*United States v. Thompson,* 493 F.2d 305 (9th Cir.), *cert. denied,* 419 U.S. 834, 95 S.Ct. 60, 42 L.Ed.2d 60 (1974), is in accord. There the court held proof that the substance involved was marijuana to be unnecessary

for conviction of the crime of conspiracy to smuggle marijuana[3] stating,

. . . the crime of conspiracy is complete upon the agreement to violate the law, as implemented by one or more overt acts (however innocent such may be), and is not at all dependent upon the ultimate success or failure of the planned scheme. . . . Thus, whether or not the substance involved was marijuana is irrelevant.

493 F.2d at 310 (citations omitted). Also, in *Carlson v. United States,* 187 F.2d 366, 369–370 (10th Cir. 1951), the court rejected a contention analogous to that of defendants here and in so doing rejected in dictum the very contention made here. Holding that a conspiracy to violate 18 U.S.C. § 415, the predecessor to § 2314, was established even though the wheat stolen and transported in interstate commerce was not shown to be of a value of $5,000 or more, as former § 415 required, the court stated,

To establish the conspiracy charge in count one, it was necessary to prove by competent evidence that appellants, by concerted actions, agreements and understandings, undertook to fraudulently obtain wheat in Oklahoma of a value of $5,000.00 or more and transport the same in interstate commerce, and that an overt act in furtherance of the conspiracy was committed by one of the conspirators. It was not necessary, however, to prove that wheat of a value of $5,000.00, or more, or that any wheat in fact was fraudulently obtained and transported. The offense was complete when the unlawful agreement was formulated and an overt act in furtherance thereof was performed.

187 F.2d at 369–370. *Cf. also Jung Quey v. United States, supra,* 222 F. at 771–772.

## C.

■ What we have said also disposes of the defendants' contention that the government's evidence was deficient in failing to prove the existence of stolen goods "of the value of $5000, or more," as required by § 2314. On this issue, *Carlson, supra,* is direct authority. Although reversing convictions of the substantive crime because the government had failed to prove that the wheat involved had a value of $5000 or more, the court upheld the conviction for conspiracy to violate § 2314 because the government did prove that defendants

by . . . agreements . . . undertook to fraudulently obtain wheat in Oklahoma of a value of $5000.00 or more and transport the same in interstate commerce . . .. It was not necessary, however, to prove that wheat of a value of $5000.00, or more, . . . in fact was fraudulently obtained and transported.

187 F.2d at 369. In the case at bar, the only necessary evidence relating to value was that the defendants agreed to transport, in interstate commerce, stolen goods worth $5,000 or more.[4]

## II.

Defendants also argue that the trial court should have excluded the testimony concerning Srbinovich's first telephone conversation with Rose because the government failed to produce the tape recording of the conversation. In the alternative, it is ar-

3. The conspiracy conviction was for violation of former 21 U.S.C. § 176a, which contained both substantive and conspiracy provisions. The substantive provision contained a knowledge requirement similar to the one in 18 U.S.C. § 2314. Section 176a was repealed in 1970. Act of Oct. 27, 1970, Pub.L. No. 91–513, tit. III, pt. B, § 1101(a)(2), 84 Stat. 1291.

4. Even though it was unnecessary to prove the value of the target goods, there was sufficient evidence to establish a value (which under 18 U.S.C. § 2311 is market value) of $5,000 or more. The owner herself placed a value, estab-

lished by an appraisal, of $25,000 on a ring that was among the target goods. Peterson valued portions of the jewelry at $100,000. Rose valued the goods at $200,000 and offered to pay Skaggs $10,000 for his share before the goods were to be sold. "Thieves' market value" was enough, standing alone. *United States v. Drebin,* 557 F.2d 1316, 1328–1329 (9th Cir. 1977). Thus *United States v. Nall,* 437 F.2d 1177 (5th Cir. 1971), relied upon by defendants for the proposition that evidence of the value of goods to their owner is insufficient proof of their market value, is inapposite.

gued that the court should have given a defense-proposed instruction dealing with the failure to produce the recording.

▮ Defendants' initial contention, that the tape recording constitutes the "best evidence" of that telephone conversation, is wholly without merit. The so-called "best evidence rule," codified and expanded to cover recordings and photographs in Fed. R.Evid. 1001 through 1004, requires only that a party seeking to prove the contents of a document introduce the original document or explain why it cannot be produced. In the case at bar, the government sought to prove the contents of a conversation, not the contents of a tape recording. Consequently, the "best evidence rule" is inapplicable. *United States v. White,* 223 F.2d 674, 675 (2d Cir. 1955); *United States v. Gonzales-Benitez,* 537 F.2d 1051 (9th Cir.), *cert. denied,* 429 U.S. 923, 97 S.Ct. 323, 50 L.Ed.2d 291 (1976); *see* 5 *Weinstein's Evidence* ¶ 1002[03] at 1002–11 (1976), Notes of Advisory Committee on Proposed Rules accompanying Fed.R.Evid. 1002, 28 U.S.C.A. Fed.R.Evid. at 768, and McCormick, *Handbook of the Law of Evidence* § 233 at 563–564 (2d ed. 1972).

▮ Defendants also argue that, because of the government's failure to produce the tape recording at trial, the court should have excluded any testimony concerning the conversation or, alternatively, should at least have given an instruction which defendants proposed.

Whether sanctions should be imposed "depend[s] on the extent of the Government's culpability for the loss or destruction and the amount of the prejudice to the defense which resulted." *United States v. Miranda,* 526 F.2d 1319, 1325–1326 (2d Cir. 1975) (applying this test to evidence producible under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)). Here the trial court found, on the basis of sufficient evidence, that the government had met its burden of satisfactorily explaining the circumstances of the loss by showing that it was the result of negligence, *see Miranda, supra,* 526 F.2d at 1326, which leaves open only the question of prejudice.

Inasmuch as the loss of the tape was caused by mere negligence, the question becomes "whether the defense was so greatly prejudiced by the unavailability of the recording at the trial as to require the imposition of sanctions against the government." *Miranda, supra,* at 1328. In the case at bar, it is highly unlikely that the defense was prejudiced by the loss of the tape. The essentials of the testimony about the conversation were fully confirmed and corroborated by later events, which independently proved the conspiracy. If the loss of the tape, which was fully aired before the jury, *cf. Miranda, supra,* at 1328, prejudiced either side, it was probably the government. The judge did not err in declining to impose sanctions on the government.

Nor did the court err in refusing to give the instruction tendered by defendants which is printed in the margin.[5] The proposed instruction was argumentative and would have erroneously exaggerated the importance of the loss of the tape in relation to the government's case as a whole.

The convictions are affirmed.

AFFIRMED.

---

5. The proposed instruction was as follows:

Where a party had evidence in its possession which that party claims would tend to establish the proof of its case, the failure to produce that evidence on demand raises a presumption that if produced, the evidence would not have the claimed effect.

This presumption does not arise if the party failing to produce presents evidence which satisfies you that its failure to produce was innocently brought about by misadventure, and without any intent of the non-producing party to conceal the evidence. If you are satisfied that such evidence was unavailable for such innocent reason, then you shall not make any presumption against the party, and you may, moreover, consider secondary evidence in the form of testimony as to the content of the missing evidence.

If, on the other hand, you are not satisfied from the evidence offered to justify the failure to produce that such failure was innocent, then the presumption takes effect. In applying the presumption, you should regard the failure to produce as affirmative evidence of the weakness of the case of the defaulting party, and you shall construe all inferences against the party in default.