UNITED STATES of America, Appellee,

v.

Pierre Michel Henri GIRY and Steven Seward, Defendants, Appellants.

No. 86–1487.

United States Court of Appeals, First Circuit.

Argued March 3, 1987.

Decided May 13, 1987.

As Amended May 26, 1987.

**122**

James W. Lawson with whom Lillian A. Wilmore and Oteri, Weinberg and Lawson, Boston, Mass., were on brief, for appellants.

Jose A. Quiles, Asst. U.S. Atty., with whom Daniel F. Lopez Romo, U.S. Atty., Hato Rey, P.R., was on brief, for appellee.

Before COFFIN and TORRUELLA, Circuit Judges, and PETTINE,* Senior District Judge.

PETTINE, Senior District Judge.

This is an appeal from convictions of conspiracy to import cocaine into the United States. The appellants, Pierre Giry ("Giry") and Steven Seward ("Seward") were indicted by a federal grand jury in the District of Puerto Rico on one count of conspiracy to import approximately 135 kilograms of cocaine into the United States, in violation of 21 U.S.C. sections 952 and 963. Giry was also indicted on two counts of using communication facilities to effectuate the conspiracy, in violation of 21 U.S.C. section 843(b). Following a four-day trial in February, 1986 a jury returned verdicts of guilty on all counts charged. On April 30, 1986 Giry was sentenced to serve a total of 28 years in prison and to pay a $250,000 fine, and Seward was sentenced to serve 10 years in prison and to pay a $20,000 fine.

* Of the District of Rhode Island, sitting by designation.

The appeal from these verdicts and sentences raises four issues: whether the evidence was sufficient to find the appellants criminally liable for a conspiracy to import cocaine into the United States; whether the United States' failure to produce a confidential informant deprived the appellants of a fair trial; whether the prosecution's closing argument deprived the appellants of a fair trial; and whether the district court applied the appropriate penalty statute in setting Giry's prison term. For reasons stated herein, we have found that none of these questions can be answered in favor of the appellants. Consequently, we affirm the verdicts entered and sentences imposed by the district court.

### Factual Background

I. Evidence of the Drug Importation Conspiracy

Giry and Seward are citizens of, respectively, France and Great Britain. The evidence purporting to show the existence of and their participation in a drug importation conspiracy consists of nine meetings and two telephone calls occurring between February, 1984 and February, 1985. In addition to Giry and Seward, participants in these encounters included Albert Cracoliche ("Cracoliche"), a confidential government informant, and two Drug Enforcement Administration agents ("DEA agents"), William Mitchell ("Mitchell") and Victor Aponte ("Aponte"). Four of the nine meetings took place on American territory—three in Puerto Rico and one in New York City—while the other five meetings took place on various foreign nations' territories in the Caribbean.

The first meeting, which was arranged by Cracoliche, took place on February 16, 1984 in the Dutch West Indies. Present were Cracoliche and his girlfriend, the two DEA agents and the appellants. Cracoliche performed the introductions, then withdrew from the conversation. Agent Mitchell identified himself as a representative of an organization in the New York, Connecticut and New Jersey area that was interested in purchasing 150 kilograms of cocaine for distribution in the New York area. The group discussed the possibility of Giry's and Seward's supplying the 150 kilograms of cocaine. Both Giry and Seward insisted that delivery could not be made on United States territory.

The second meeting took place in Puerto Rico on March 9, 1984. Present were Cracoliche, the two DEA agents and the appellants. The agents first showed Giry $3,000,000 in cash at a local bank, after which they drove to a local hotel for a meeting with both Giry and Seward, dropping off Cracoliche along the way. At the hotel it was agreed that the cocaine and the cash payment would be exchanged in the French West Indies. This was the last meeting attended by either Seward or Cracoliche. Cracoliche's subsequent involvement was limited to arranging, without attending, the third, fourth, sixth and seventh meetings.

The third through the seventh meetings involved only Giry and the two DEA agents. These five meetings took place between March and October, 1984 and were located in, respectively, Puerto Rico, the Dutch West Indies, Curacao, the Dutch West Indies and Puerto Rico. Discussion at these meetings focused on delays, price increases and quality reductions that Giry claimed were being imposed by his Columbian supply sources. In response to these problems, Giry and the DEA agents reduced the quantity of the prospective purchase from 150 to 135 kilograms of cocaine. At the seventh meeting, Giry told the DEA agents that Seward had been arrested in Connecticut while working on a separate marijuana smuggling operation that Giry had organized.

On October 30, 1984 Giry met with agent Mitchell and another undercover agent at La Guardia Airport in New York. The cocaine price had again increased, and the quantity to be purchased was therefore reduced to 100 kilograms. Giry stated that if Mitchell still objected to the additional price increase, he would pay Mitchell $35,-000 and stop the deal. But Mitchell declined this offer, and the parties made plans to consummate the deal within four to six weeks in the French West Indies.

Apparently, on either December 18 or 19, 1984, Giry helped load 100 kilograms of cocaine onto a fishing trawler on the Columbian coast. A U.S. Coast Guard cutter spotted the trawler at sea and gave chase, and the trawler's crew dumped the cocaine overboard. Over a month later, on January 31 and February 1, 1985, Giry telephoned agent Mitchell to arrange another meeting, answering "yes" to Mitchell's question as to whether the cocaine had been lost. These two calls are the basis of Giry's conviction on the two counts alleging violations of 21 U.S.C. section 843(b).

The ninth meeting, with only Giry and the two agents present, took place on February 3, 1985 in Santo Domingo. Giry explained that he had helped load cocaine onto the boat that had been intercepted the previous December, that the crew had dumped all the cocaine overboard before the Coast Guard boarded the boat, and that his Columbian suppliers still wanted to consummate the 100 kilogram transaction. The next day, agent Mitchell called Giry to a meeting at the Santo Domingo airport. Upon arriving at the airport, Giry was detained, deported to Puerto Rico and arrested by American authorities.

## II. The Government's Failure to Produce Cracoliche

On March 26, 1985 Giry filed a motion requesting the court to order the production of the government's confidential informant, whose name was then undisclosed. On June 26, 1985, after an evidentiary hearing, U.S. Magistrate Justo Arenas issued an opinion and order granting Giry's motion. The Magistrate found that Albert Cracoliche "participated in the enterprise as an agent of the United States and was neither a tipster nor an observer." Following *Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), the Magistrate concluded that the government was required either to produce the informant or to disclose his whereabouts to Giry, and he ordered the government to file within ten days a written report of its efforts to locate Cracoliche.

On July 5, 1985 the government moved for a fifteen-day extension of time to file the required report, stating that Cracoliche was last known to be in France and that diligent efforts to locate him were under way. Thereafter, apparently upon learning that efforts were being made to find him, Cracoliche telephoned agent Aponte. They scheduled an August 20, 1985 meeting in Puerto Rico at which Giry's attorney, James Lawson, could interview Cracoliche. Lawson flew to Puerto Rico on August 19, but was informed by agent Aponte that Cracoliche would not be able to attend the next day's meeting.

On September 23, 1985 the district court held a status conference at which it ordered the government to attempt to contact Cracoliche, to schedule a meeting between Cracoliche and the defense attorneys and to inform the court by September 30 of the government's efforts to carry out these orders. No meeting was arranged, and on September 30 the government filed an "informative motion," consisting of agent Aponte's recitation of efforts made to locate and produce Cracoliche.

Almost five months later, on February 18, 1986, the district court held a hearing on all pending pre-trial motions, which included Giry's motion to dismiss the indictments based on the government's failure to produce Cracoliche. On the same day, the government filed a second informative motion, incorporating and supplementing its first informative motion. As recited in these motions, the efforts made by the government to locate and produce Cracoliche included the following: after the government was first ordered to locate Cracoliche in June, 1985, agent Aponte made inquiries as to Cracoliche's whereabouts through contacts at the French National Police Narcotics Section; apparently as a result of these inquiries, Cracoliche telephoned Aponte in August, 1985, and the two scheduled an August 20 meeting in Puerto Rico to which the defense attorney would be invited; on August 19, Cracoliche spoke by telephone with Aponte and refused to travel from the French West Indies to Puerto Rico, expressing fears for his safety; Aponte then explained the situ-

ation to defense attorney Lawson, who was unable to travel to the French West Indies at that time; agent Aponte made further attempts to telephone Cracoliche in September, receiving a pre-recorded message in French to the effect that the number was not in service; Aponte asked Jean Ravenello, a French Liaison Officer in New York, to investigate this last known telephone number of Cracoliche, but received no further leads; and agent Mitchell made two further inquiries through Liaison Officer Ravenello as to Cracoliche's whereabouts, but these were similarly unavailing.

On February 20, 1986 the district court issued a written opinion and order denying Giry's motion to dismiss. The court found, contrary to the Magistrate's finding, "that the informer's participation is more of a conduit than a principal to the enterprise," concluding "that the informant's participation is not so intertwined as movant would like the Court to believe." The district court further found that the government "carried its burden in showing good faith efforts to locate the informer." Finally, the court found that the defendants' sixth amendment right to confront adverse witnesses would not be violated by the unavailability of Cracoliche, both because no statements by Cracoliche would be introduced at trial and because the defendants would have the opportunity to cross-examine both agents Aponte and Mitchell at trial.

### Discussion

I. Sufficiency of the Evidence of a Drug Importation Conspiracy

In reviewing the sufficiency of the evidence, "we consider the evidence as a whole, taken in the light most favorable to the government, together with all legitimate inferences to be drawn therefrom, to determine whether a rational trier of fact could have found each defendant guilty beyond a reasonable doubt." *United States v. Drougas,* 748 F.2d 8, 15 (1st Cir. 1984). In conspiracy prosecutions, the evidence must support a rational trier's finding, "beyond a reasonable doubt that each

defendant had the specific intent to violate the substantive statute; such proof can be largely circumstantial." *United States v. Hyson,* 721 F.2d 856, 860 (1st Cir.1983).

It is this latter finding that appellants Giry and Seward challenge. They contend that the evidence introduced at trial was insufficient for a jury to find that they possessed the requisite knowledge and intent for the substantive crime alleged as the objective of their conspiracy. The conspiracy statute under which they were convicted, 21 U.S.C. section 963, imposes criminal liability upon "[a]ny person who attempts or conspires to commit any offense defined" in subchapter II of the Drug Abuse Prevention and Control Act, 21 U.S.C. sections 951–966. The substantive offense found to have been the objective of the appellants' conspiracy, 21 U.S.C. section 952(a), prohibits the "import[ation] into the United States from any place outside thereof" of certain controlled substances, including cocaine.

The appellants argue that they agreed only to import cocaine from Columbia to the French West Indies, and that the final objective of their conspiracy was the consummation of the planned sale to agents Aponte and Mitchell in the French West Indies. Under this theory, the appellants lacked the specific intent to import cocaine into the United States and hence lacked the specific intent to violate the substantive statute.

The problem with this theory is that both Giry and Seward agreed to arrange and carry out the cocaine sale after being told by agents Aponte and Mitchell of the latters' plans to import the cocaine for distribution in the New York area. Giry and Seward argue that the agents' expressed importation plans cannot be imputed to the conspiracy charged in the indictment, for three reasons: first, government agents do not count as co-conspirators; second, the agents never actually intended to import the cocaine into the United States; and third, any genuine importation plans on the part of the appellants' buyers would constitute a wholly separate conspiracy involving

only the buyers and perhaps some subsequent purchasers.

■■■ The appellants' first argument, although true, is irrelevant. The rule that government agents do not count as co-conspirators has relevance only "in situations where the conspiracy involves only [one] defendant and a government informer. In that situation there can be no conspiracy because it takes two to conspire and the government informer is not a true conspirator." *United States v. Martino*, 648 F.2d 367, 405 (5th Cir. Unit A June 1981), *vacated in part on other grounds sub nom. United States v. Holt*, 650 F.2d 651 (5th Cir.1981), *cert. denied*, 456 U.S. 943, 102 S.Ct. 2006, 72 L.Ed.2d 465, *and cert. denied*, 456 U.S. 949, 102 S.Ct. 2020, 72 L.Ed.2d 474, *aff'd on reh'g*, 681 F.2d 952 (Former 5th Cir.1982) (en banc), *aff'd sub nom. Russello v. United States*, 464 U.S. 16, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983). In the instant case the plurality requirement is satisfied by the participation of two "true" conspirators, Giry and Seward. The participation of government agents therefore does not negate the existence of the conspiracy charged.

■■ The appellants' second argument rests on the fact that the DEA agents never actually intended to import the cocaine into the United States. Since the persons who were to carry out the actual importing never intended to do this essential act, it is argued that the goal of importing the cocaine to the United States cannot be imputed to the conspiracy. But this logic rests on the faulty assumption that an expressed conspiratorial objective is negated by its factual impossibility. On the contrary, "[t]he crime of conspiracy, whether under the drug statute or under the general conspiracy statute, is complete upon the agreement to do an unlawful act as implemented by one or more overt acts. Factual impossibility is no defense." *United States v. Senatore*, 509 F.Supp. 1108, 1110 (E.D.Pa.1981) (statutory citations omitted); *see also United States v. Jannotti*, 673 F.2d 578, 591 (3d Cir.) (en banc), *cert. denied*, 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982), *aff'd on later appeal*,

729 F.2d 213 (3d Cir.), *cert. denied*, 469 U.S. 880, 105 S.Ct. 243, 83 L.Ed.2d 182 (1984) ("Because an agreement between two or more persons to commit criminal acts poses, in and of itself, a serious danger to social order, it is proscribed by the law of conspiracy ... It is ... irrelevant that the ends of the conspiracy were from the very inception of the agreement objectively unattainable." (citations omitted)).

The rule that factual impossibility is no defense has been applied even when the reason for the impossibility is that certain acts essential to the conspiracy's success are to be carried out by individuals who turn out to be government agents. For instance, in *United States v. Seelig*, 498 F.2d 109 (5th Cir.1974), three government agents made plans to purchase cocaine from Seelig and two other individuals. Seelig and his partners were arrested before the sale was consummated, and all three were indicted and convicted for conspiracy to possess with intent to distribute cocaine. On appeal, Seelig and his partners argued that they could not be held criminally liable for conspiracy to distribute cocaine because their prospective purchasers were government agents who never intended to distribute it. The Fifth Circuit rejected this argument, stating:

> We are also unpersuaded that we should adopt the rationale ... that a conspiracy conviction cannot result where an "essential" act to the consummation of the substantive offense is to be performed by a government agent. Such an approach, we think, is inconsistent with the basic principle that a conspiracy is proved when it is established that two or more persons agreed to commit an offense and one of them engaged in an overt act in furtherance of the agreement.

498 F.2d at 112.

■■ Similarly, in *United States v. Rose*, 590 F.2d 232 (7th Cir.1978), *cert. denied*, 442 U.S. 929, 99 S.Ct. 2859, 61 L.Ed.2d 297 (1979), two government agents made plans with Rose and Peterson for a burglary and subsequent distribution of the stolen goods. The agents were to commit the

burglary, and Rose and Peterson were to help sell the stolen goods. The burglary was never in fact committed, but the agents called Rose and Peterson on the pretense that the four should meet to divide up the stolen goods. Rose and Peterson were arrested, indicted and convicted for conspiring to transport in interstate commerce more than $5,000 in goods known to be stolen. On appeal, Rose and Peterson raised the factual impossibility defense, arguing "that a conspiracy ... cannot exist unless and until someone has stolen the goods the conspirators plan to transport in interstate commerce," 590 F.2d at 235. The Seventh Circuit rejected this argument, reasoning that

> it ignores the nature of the crime of conspiracy, which is an agreement to commit a substantive crime, accompanied by an overt act in furtherance of the agreement. Whether the substantive crime itself is, or is likely to be, committed is irrelevant.... All that was necessary, in addition to an overt act, was that the intended future conduct they had agreed upon include all the elements of the substantive crime.

590 F.2d at 235. Under the logic of *Rose* and *Seelig,* a conspiracy to import cocaine into the United States can exist even when all the conspirators agree that the task of importation is to be carried out by individuals who turn out to be government agents.

The appellants' third argument asserts that any conspiratorial plans beyond the planned cocaine sale in the French West Indies belong to a wholly separate conspiracy. Accepting *arguendo* that a conspiracy to import cocaine into the United States existed, Giry and Seward argue that this was separate from the conspiracy to import cocaine into the French West Indies, and that they belonged to the latter but not the former conspiracy. But this argument runs counter to the principles regularly applied by the federal courts in analyzing the structure and divisibility of drug conspiracies.

A scheme to manufacture and distribute a large quantity of illicit drugs involves a great many discrete steps and includes a large number of people, most of whom know few of the other participants in the scheme. Thus one could describe the overall scheme as the sum of many discrete conspiracies to manufacture or distribute illicit drugs. But the federal courts have adopted the opposite view, permitting the entire scheme to be characterized as a single conspiracy and treating each discrete step as one of the links in an indivisible chain. *See United States v. Inadi,* 748 F.2d 812, 817 (3d Cir.1984), *rev'd on other grounds,* — U.S. —, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986) ("[W]here a number of parties combine to manufacture, distribute and retail narcotics there is a single conspiracy—a so-called 'chain' conspiracy—despite the fact that there has been no direct contact whatsoever amongst some of its links."); *United States v. Moosey,* 735 F.2d 633, 635–36 (1st Cir.1984); *United States v. Warner,* 690 F.2d 545, 549 (6th Cir.1982); *see also United States v. Jabara,* 618 F.2d 1319, 1327 (9th Cir.), *cert. denied,* 446 U.S. 987, 100 S.Ct. 2973, 64 L.Ed.2d 845, *and cert. denied,* 449 U.S. 856, 101 S.Ct. 154, 66 L.Ed.2d 71, *and cert. denied,* 449 U.S. 856, 101 S.Ct. 154, 66 L.Ed.2d 70 (1980); *United States v. Magnano,* 543 F.2d 431, 434 (2d Cir.1976), *cert. denied,* 429 U.S. 1091, 97 S.Ct. 1100, 51 L.Ed.2d 536, *and cert. denied,* 429 U.S. 1091, 97 S.Ct. 1101, 51 L.Ed.2d 536 (1977).

It is true that the above cases dealt with domestic manufacturing and distribution chains rather than with networks that crossed the national border. But the underlying reasons for treating each vertical drug network as a single chain apply with equal force to conspiracies that begin outside the border. The characterization of the vertical network as a single chain rests upon the interdependent nature of the enterprise. Each participant's financial gain depends upon the successful accomplishment of all the illegal links in the chain, from manufacturing, transporting and wholesaling the drugs down to each retail sale on the street. Thus, in

> a "chain" conspiracy, the agreement can be inferred from the interdependent nature of the criminal enterprise. Conspiracies to distribute narcotics, which nor-

mally involve numerous sales and resales of drugs until they reach the ultimate consumers, are often "chain" conspiracies. Because the success of participants on each level of distribution is dependent upon the existence of other levels of distribution, each member of the conspiracy must realize that he is participating in a joint enterprise, even if he does not know the identities of many of the participants. Accordingly, a single conspiracy does not become multiple conspiracies simply because each member of the conspiracy did not know every other member, or because each member did not know of or become involved in all of the activities in furtherance of the conspiracy.

*United States v. Warner,* 690 F.2d 545, 549 (6th Cir.1982) (citations omitted).

This theory is particularly applicable to the roles assumed by Giry and Seward, i.e., suppliers of a large quantity of cocaine to parties believed to be importers working for a large, domestic distribution network. "[O]ne who deals in large quantities of narcotics may be presumed to know that he is a part of a venture which extends beyond his individual participation ... 'Thus the conspirators at one end of the chain kn[o]w that the unlawful business would not, and could not, stop with their buyers....'" *United States v. Magnano,* 543 F.2d 431, 434 (2d Cir.1976) (*quoting United States v. Bruno,* 105 F.2d 921, 922 (2d Cir.), *rev'd on other grounds,* 308 U.S. 287, 60 S.Ct. 198, 84 L.Ed. 257 (1939)).

The appellants cite *United States v. Peoni,* 100 F.2d 401 (2d Cir.1938), in support of the argument that their conspiracy extended no further than the planned sale of cocaine in the French West Indies. Peoni, the defendant in that case, sold counterfeit bills to one buyer, who sold them to a subsequent buyer. The subsequent buyer was arrested while trying to pass the bills as real currency. Peoni was convicted on a multiple count indictment that included one count of conspiring with the subsequent buyer to possess the counterfeit bills. The Second Circuit reversed Peoni's convictions, reasoning that "a conspiracy ... imports a concert of purpose, and ... Peoni had no concern with the bills after [his own buyer]

paid for them ... Nobody is liable in conspiracy except for the fair import of the concerted purpose or agreement as he understands it...." 100 F.2d at 403.

■ We are not persuaded that the logic of *Peoni* applies to this case. The rationale of *Peoni* is that a seller of illegal items has no cognizable stake in any subsequent sale of the items. That is, after the manufacturing, importing, and transporting to a terminal point of distribution have been completed, subsequent sales to a myriad of local retailers would not normally be part of the basic conspiracy. Such reasoning bears little relevance to the situation under review here. A large-scale drug wholesaling scheme would not be economically viable but for the wholesaler's access to an elaborate distribution and retailing network. In *Peoni,* the Second Circuit indicated neither the scale of the counterfeiting scheme under review nor the positions held by the defendants-appellants therein, and we see no reason for transposing its general language onto a specific class of cases where it would be inapposite. We agree with the Second Circuit, which for similar reasons has seen fit to disregard its *Peoni* decision in the drug wholesaling context: "[p]recedent within this Circuit abounds for the proposition that one who deals in large quantities of narcotics may be presumed to know that he is part of a venture which extends beyond his individual participation," *United States v. Magnano,* 543 F.2d 431, 434 (2d Cir.1976).

The appellants also rely on *United States v. Conroy,* 589 F.2d 1258 (5th Cir.), *cert. denied,* 444 U.S. 831, 100 S.Ct. 60, 62 L.Ed.2d 40 (1979), in arguing that their conspiratorial objective encompassed only the importation of the cocaine into the French West Indies. In *Conroy,* a boat carrying marijuana destined for the United States was seized, and its crew were indicted and convicted for conspiring to import the drugs. Walker, one of the crew, contended that he thought the cargo was destined for Canada. Although the Fifth Circuit held that sufficient evidence had been introduced for a jury to disbelieve Walker's

contention, the court stated in dictum, "if it be assumed that Walker indeed planned only to cooperate in the export of marijuana to *Canada*, there would be no criminal intent on his part cognizable in an American court ...," 589 F.2d at 1270 (emphasis in original). This dictum is irrelevant to the case *sub judice*, because uncontradicted evidence shows that agents Aponte and Mitchell represented themselves as intermediaries working for a large drug distribution network in the greater New York area. In addition, the agents unsuccessfully sought to have the appellants agree to a delivery on American territory; the agents brought Giry to a Puerto Rico bank, where he was shown three million American dollars that were to finance the deal; and the negotiations involved four meetings on American territory—three in Puerto Rico and one in New York. Taken together, this constitutes more than sufficient evidence to prove beyond a reasonable doubt that the appellants knew they were supplying drugs for importation and distribution in the United States.

■ We believe that our decision in *United States v. Cordero*, 668 F.2d 32 (1st Cir.1981), is controlling here. In that case, a DEA agent made plans with a pilot named Sorren to smuggle cocaine into the United States. Sorren brought Cordero into the deal, to supply the drugs that Sorren planned to fly into the United States. Sorren and Cordero appealed their convictions, arguing that they belonged to separate conspiracies. Cordero maintained "that there is no evidence that she knew the drugs were bound for the *Commonwealth of Puerto Rico* or anywhere else within the customs territory of the United States." 668 F.2d at 38 (emphasis in original). In affirming Cordero's and Sorren's convictions, we rejected the argument

> that there is inadequate evidence for a jury to find that they engaged in a single conspiracy to import cocaine into Puerto Rico ... [Cordero] knew that Sorren, along with Turner, was to transport the cocaine to Puerto Rico ... Cordero and Sorren each knew of the other's role in the enterprise and each knew that the

other's role was essential for the success of the enterprise.

668 F.2d at 41–42.

■ It is true that the importing in the instant case was to be carried out by a government agent rather than by a genuine co-conspirator. But this is a distinction without significance, where the evidence establishes that each defendant knew of the overall scheme, had a stake in it, and did his part to make it succeed. *See, United States v. Seelig*, 498 F.2d 109 (5th Cir. 1974), and *United States v. Rose*, 590 F.2d 232 (7th Cir.1978), discussed at length *supra*. As the Seventh Circuit concluded in a nearly identical case, the fact that "only the DEA agents were involved in importing the cocaine" does not shield the seller from liability "as a conspirator in the importation," *United States v. Schmucker-Bula*, 609 F.2d 399, 401 (7th Cir.1980). There, as here,

> [T]he evidence is more than sufficient to show the intent of the defendant[s] ... to further the purpose of the buyers to import the cocaine ... [T]he agents informed the conspirators of their plan to smuggle the cocaine into the United States. With this knowledge of the agents' purpose ... the conspirators knowingly encouraged and arranged the transportation of drugs that would end in the United States ... [T]he defendants cannot escape liability merely because the purchasers took primary responsibility for the smuggling arrangements.

609 F.2d at 401–02.

II. Consequences of the Government's Failure to Produce the Confidential Informant Albert Cracoliche

The appellants argue, based upon *Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), and its progeny that the government's failure to produce Cracoliche deprived them of a fair trial. They contend that Cracoliche's testimony was critical "to the defense that there was no intent toward the United States" and "to their entrapment/due process defense ...," appellants' brief at 28. The gist of the proffered entrapment defense is that the appellants were intimidated into going

along with the deal by agents Aponte's and Mitchell's "implications of themselves as dangerous mobster-types with an 'organization' and 'Atlantic City connections,'" *id.* at 33. Cracoliche could testify "that Giry really wanted out of the cocaine picture and was persistently trying to extricate himself without injury or offense that might trigger retaliation of some sort from these Atlantic City-connected cocaine Mafiosos ...," *id.* at 35.

Whether the government has a duty to disclose the names and whereabouts of its confidential informants "depend[s] on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors." *Roviaro v. United States,* 353 U.S. 53, 62, 77 S.Ct. 623, 629, 1 L.Ed.2d 639 (1957). When this duty to produce names and addresses attaches, the government is required "to produce correct information or at least to have exercised diligence reasonable under the circumstances to locate the informer," *United States v. Davila Williams,* 496 F.2d 378, 382 (1st Cir.1974). In the case below, the district court held a pre-trial hearing to consider, among other matters, defendant Giry's motion to dismiss the indictments based upon the government's failure to locate Cracoliche. The district court denied the motion, finding both that Cracoliche was not a critical witness and that the government had carried its burden in showing good faith efforts to locate Cracoliche. We do not find error in this application of the factors enunciated in *Davila Williams, supra.*

■ We find ample support for the district court's conclusion that Cracoliche was not a critical witness. Cracoliche attended the first meeting and part of the second meeting, but did not participate in any of the negotiations. His only other involvement was to arrange, without attending, the third, fourth, sixth and seventh meetings. The district court correctly concluded that Cracoliche served as "more of a conduit than a principal to the enterprise." His role was not of a kind that readily triggers the government's duty to disclose.

*Cf. United States v. Alonzo,* 571 F.2d 1384, 1387 (5th Cir.), *cert. denied,* 439 U.S. 847, 99 S.Ct. 147, 58 L.Ed.2d 149 (1978) ("It is well settled that the government is not required to disclose the identity of an informant who is a mere tipster and not an active participant in the offense charged even though he was present during the transaction in question.").

The appellants nevertheless maintain that Cracoliche's account of his few conversations with Giry would have provided significant exculpatory evidence. The appellants fail to specify how such testimony would have supported their alleged defenses, i.e., lack of specific intent and entrapment. They contend that a specific offer of proof as to Cracoliche's testimony is precluded by their inability to interview Cracoliche.

■ We agree that the appellants cannot be expected to submit a detailed proof offer regarding a witness they have been unable to interview. But this does not relieve them from having to provide at least some explanation of how Cracoliche's testimony would have supported their alleged defenses. *Cf. United States v. Skeens,* 449 F.2d 1066, 1070 (1971) ("[S]peculation ... is not sufficient to meet the heavy burden which rests on an accused to establish that the identity of an informant is necessary to his defense."). The appellants' first defense, that they lacked specific intent to import cocaine, is untenable so long as uncontroverted evidence shows that they knew of their buyers' importation plans from the outset of the conspiracy. To render the defense tenable, Cracoliche would have had to testify that the DEA agents did *not* represent themselves as intermediaries for an American distribution network. But the appellants make no such claim regarding Cracoliche's testimony. Nor could they make such a claim, in light of their second defense, which postulates the appellants' entrapment by the DEA agents' "implications of themselves as dangerous mobster-types with an 'organization' and 'Atlantic City connections,'" appellants' brief at 33.

A similar problem arises with respect to the entrapment defense. "Before a defendant is entitled to have the jury consider the issue of entrapment, he must offer some evidence, amounting to more than a scintilla, that he lacked a predisposition to commit the offense." *United States v. Kakley*, 741 F.2d 1, 3 (1st Cir.), *cert. denied*, 469 U.S. 887, 105 S.Ct. 261, 83 L.Ed.2d 197 (1984). In this case, convincing evidence of the appellants' predisposition to engage in drug importing was provided by agent Mitchell's testimony about the seventh meeting with Giry. According to Mitchell, Giry told the agents that he had recently sent four boatloads of marijuana into the United States, and that co-conspirator Seward had been arrested when one of the boats was seized in American waters, trial transcript ("transcript") at 109–110. To challenge such compelling evidence of predisposition, Cracoliche would have had to testify that Giry never made such statements, or at least that Giry was lying to Mitchell when he made those statements. But the appellants never proposed to offer Cracoliche for this purpose. Rather, Cracoliche allegedly would have testified "that Giry really wanted out of the cocaine picture and was persistently trying to extricate himself," appellants' brief at 35. It is questionable whether this theory negates Mitchell's testimony showing Giry's predisposition. Even if it did, Cracoliche's testimony would have been largely, if not entirely, cumulative on this point. The facts that allegedly show Giry's extrication attempts—Giry's repeated reports of increases in the manufacturers' prices, and his offer to cancel the deal for $35,000 at the eighth meeting—were already put before the jury by other witnesses.

 These considerations lead us to doubt whether disclosure of Cracoliche's identity and whereabouts would have been required under *Roviaro v. United States*, *supra*. Assuming that disclosure was required, however, we cannot find that the government's failure to produce Cracoliche deprived the appellants of a fair trial under the standards of *Roviaro*. As this court pointed out in *United States v. Davila Williams, supra:*

the government's duty under *Roviaro* to produce names and addresses requires it to produce correct information or at least to have exercised diligence reasonable under the circumstances to locate the informer ... How far it must go to keep track of, or search for, an informer ... depends on many factors including the extent of the government's control over the witness, the importance of the witness's testimony, the difficulty of finding him, and similar matters.

496 F.2d at 382.

In this case, the informant was a French citizen who never resided in the United States, whose physical address was never known to the government and whom government agents were able to reach only by telephone. Opinion and Order of February 20, 1985 at 3, *reprinted in* Appendix for Defendants/Appellants, Volume I at A408, A410. The government's efforts to locate and produce Cracoliche included inquiries through the French National Police, a planned meeting in Puerto Rico from which Cracoliche allegedly backed out at the eleventh hour, further attempts to reach him by telephone and subsequent inquiries through a French Liaison Officer in New York. Nothing in the record indicates that the government had any contact with Cracoliche apart from these attempts to locate him for the trial of Giry and Seward.

Were Cracoliche demonstrably important to the appellants' presentation of their defense, we might have found, under *Davila Williams*, that the government failed sufficiently to keep track of the informant in the months following Giry's arrest. But where, as here, the record indicates that the informant's testimony is relatively unimportant, and that the government neither controlled his whereabouts nor otherwise dealt with him, we cannot say that the district court erred in finding these efforts to have been sufficient. Under the circumstances of this case, the government's failure to produce its confidential informant for trial did not amount to a violation of *Roviaro*.

III. Whether the Prosecutor's Closing Argument Deprived the Appellants of a Fair Trial

The appellants allege a number of improprieties in the prosecutor's closing argument and contend that these deprived them of a fair trial. Three types of improprieties are alleged. First, the appellants contend that one of the prosecutor's arguments constituted an improper comment on their failure to testify. Second, the appellants point to five comments by the prosecutor that allegedly misstated the law and prejudicially inflamed the jury. Third, the appellants contend that the prosecutor argued facts not in evidence.

A. *Comment on the defendants-appellants' failure to testify*

In closing argument, the prosecutor stated, "the defense during the opening argument told you that this man was subjected to a lot of pressures. The evidence is to the contrary." Transcript at 396. Later in his closing, the prosecutor stated,

It has been suggested to you by Mr. Lawson that Mr. Giry was put under a lot of pressure by the agents who called themselves mafia. What pressure is there? ... Nobody put a gun in his back. Nobody pushed him. He was there out of his own volition and so was Mr. Seward.

Transcript at 425.

The appellants argue that these statements amount to improper comment on their failure to testify. They reason that Cracoliche was the only person other than themselves who could have presented evidence of the pressure applied by the DEA agents. Thus, with Cracoliche unavailable, any comment that evidence of pressure is lacking amounts to a comment upon the appellants' failure to testify.

 We do not find the appellants' reasoning persuasive. The evidence upon which the appellants rest their claim of having been pressured consists of the following: the DEA agents' representations of themselves as big-time mobsters, and their insistence on going ahead with the deal in spite of Giry's alleged extrication

attempts, i.e., Giry's reports of time delays and price increases and his offer to pay $35,000 to cancel the deal. There is no variance between the appellants' evidence and the prosecution's evidence on this issue, nor have the appellants specified any variance that would have resulted from either Cracoliche's or Giry's testimony. The argument as to whether the appellants were pressured thus consists of a dispute over the proper inferences to be drawn from a single set of facts.

Viewed in this light, the prosecutor's statements about the lack of evidence of pressure cannot be deemed commentary on the defendants-appellants' failure to testify. *See United States v. Maccini*, 721 F.2d 840, 843 (1st Cir.1983) (prosecutor's argument held not violative of the defendant's fifth amendment privilege against self-incrimination where "the language does not 'naturally and necessarily' comment on [the] accused's failure to testify" (citation omitted)). To hold otherwise would in effect prohibit prosecutors from arguing about the inferences to be drawn from uncontested evidence whenever a defendant asserted in wholly conclusory fashion that an unavailable witness's testimony would support a contrary inference. We decline to adopt such a rule in this case, and we therefore hold that the prosecutor's statements about the lack of evidence of pressure fell within the permissable range of closing argument tactics.

B. *Misleading and inflammatory comments*

The appellants allege that five comments by the prosecutor misstated the law of conspiracy and prejudicially inflamed the jury. All of the cited comments are from the prosecution's argument that Giry and Seward had the specific intent to commit the substantive crime of importing cocaine. The most egregious comment concerned Giry's third meeting with the agents in Puerto Rico. Arguing that this negated Giry's denial of the specific intent to import, the prosecutor stated, "[s]ounds like Peter who for the third time denied Christ," transcript at 396. In other improp-

er commentary, the prosecutor called the appellants "cowards" for refusing to deliver the cocaine on American territory and admonished the jury that, if the appellants willfully agreed "to sell that cocaine so it could be imported into the United States, then you must not assuage them for being cowards," transcript at 427. Two other comments criticized by the appellants compared their roles in the importation conspiracy with other kinds of criminal conduct. One such comment compared Giry to a person who throws a stone into a crowd, injuring a particular individual, then denies having the "intention of hitting that man in particular," transcript at 397. The other analogy compared the appellants to two individuals who "agree to kill the Judge," with one furnishing money for a gun, the other purchasing the gun, and both lying in wait until the Judge appears: then, if "when you fire, the weapon is no good because it was defective, that doesn't mean there was no conspiracy," transcript at 426. The fifth comment cited by the appellants consists of references to a separate scheme to smuggle four boatloads of marijuana into the United States. In conversation with the DEA agents, Giry claimed to have organized the scheme and said that Seward had been arrested when the Coast Guard intercepted one of the boats, transcript at 397.

■ Of the five comments cited in their brief, the appellants objected contemporaneously to none and objected at the close of argument only to the example of a conspiracy to kill the judge, transcript at 453–55. The appellants' failure to object to the other four comments at trial precludes their consideration on appeal absent a showing of plain error. Fed.R.Crim.P. 52; *United States v. Fuller*, 768 F.2d 343, 347 (1st Cir.1985); *see also United States v. Young*, 470 U.S. 1, 15, 105 S.Ct. 1038, 1047, 84 L.Ed.2d 1 (1985) ("[T]he plain error exception to the contemporaneous-objection rule is to be 'used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.'" (citation omitted)). Of the four comments to which no objection was taken, we believe that only the reference to Peter's denial of

Christ conceivably imparted such prejudice as to warrant further discussion under the plain error standard. Accordingly, we confine our review here to this comment and to the analogy drawn between the appellants' conduct and a plot on the judge's life.

■ There is no question that these comments were improper. The prosecutor's reference to a plot on the judge's life improperly likened the appellants' conduct to a violent attack upon the court. The prosecutor's reference to Peter's denial of Christ constituted an irrelevant and inflammatory appeal to the jurors' private, religious beliefs. Such comments warrant especial condemnation when uttered by the government's attorney, whose duty is as much "to refrain from improper methods calculated to produce a conviction as it is to use every legitimate means to bring about a just one," *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935).

■ However, the issue here does not turn solely on whether the government acted improperly. Rather, the question is whether the trial "was so prejudiced by the prosecutor's misstatements as to affect its outcome, or to warrant a sanction for the purpose of deterring future prosecutorial misconduct," *United States v. Maccini*, 721 F.2d 840, 846 (1st Cir.1983) (citations omitted). To answer this question, a three-step inquiry is employed: "(1) whether the prosecutor's conduct was isolated and/or [less than] deliberate, (2) whether the trial judge's instructions were strong and explicit, and (3) whether it is likely that any prejudice that survived the judge's instructions could have affected the outcome of the case," *Maccini, supra*, 721 F.2d at 846. On the first step of the inquiry, deliberateness is less likely to be found where the impropriety appears to have been provoked by inflammatory argument on the part of opposing counsel. *Id.* at 846–47. On the third step of the inquiry, prejudice that survives the charge is deemed less likely to have affected the outcome of the trial where strong evidence supports the prosecution's case, *id.* at 847; *cf.* 3A Wright,

Federal Practice and Procedure § 854 at 305 ("Perhaps the single most significant factor in weighing whether an error was harmful is the strength of the case against the defendant." (citations omitted)).

Here, the prosecutor's improper statements appear to have been deliberate. They were relatively isolated incidents, but they were wholly unprovoked. The complete irrelevance of the reference to Peter's denial of Christ suggests that its sole purpose was to inflame the jury's passions.

However, the judge's instructions to the jury at the close of argument were strong and explicit. The instructions thoroughly addressed each of the issues that may have been clouded by the prosecutor's misstatements. At the outset, the court made clear that "[t]he statements and arguments of counsel are not evidence in the case," and instructed the jury "to consider only the evidence in the case," transcript at 430. *Cf. Maccini, supra,* 721 F.2d at 847 (finding the impact of prosecutorial misstatements mitigated by instructions telling the jury, among other things, to "[b]ear in mind that arguments of counsel ... are not evidence").

The court gave a strong charge about the presumption of innocence and about the defendants' privilege not to testify, stressing more than once that no adverse inferences may be drawn from their failure to testify, transcript at 432–33. More important, the court gave very clear and comprehensive instructions about the separate elements of conspiracy that must be proved beyond a reasonable doubt before guilt can be found, including the agreement to commit a substantive crime, willful membership in the conspiracy, the commission in furtherance of the agreement of at least one of the overt acts charged in the indictment, and specific intent to commit the substantive crime, transcript at 438–45. Also, consistent with Fed.R.Evid. 404(b), the court gave a thorough instruction confining the evidence of a separate marijuana-smuggling scheme to the issue of whether each defendant possessed the specific intent to import cocaine, transcript at 447–48.

■ In sum, the judge's instructions were sufficiently strong and explicit to have significantly reduced the prejudicial impact of the prosecutor's misstatements. It is possible that the instructions did not entirely neutralize the prejudice. But given the unambiguous evidence of the appellants' intent to supply a large quantity of cocaine to ostensible domestic importers, we do not find that any surviving prejudice could have affected the outcome of the trial.

### C. *Arguing facts not in evidence*

■ The appellants contend that the prosecutor argued facts not in evidence when he said, "[t]hey agreed among themselves and among other persons to sell that cocaine so that in turn it could be brought to Puerto Rico," transcript at 426. The appellants argue that this comment was improper because "[t]here is no evidence that there was any agreement to sell that in any respect hinged on a further importation into the United States or into any particular place," appellants brief at 47. Here the appellants are plainly wrong. By the terms of their own proffered entrapment defense, the appellants planned to sell cocaine to agents posing as importers for a large, domestic distribution network. The real error in the cited comment, which the appellants do not mention, is that the apparent destination of the cocaine was New York, not Puerto Rico. The appellants made no contemporaneous objection to this inaccuracy, and we see no plain error in the court's omission to give a curative instruction on this point.

### IV. Whether the District Court Applied the Appropriate Penalty Statute in Setting Giry's Prison Term

■ On April 30, 1986 the district court sentenced Giry to serve a 20–year prison term and to pay a $200,000 fine for his role in the conspiracy to import cocaine, and to a total of eight years in prison and $50,000 in fines for the two counts of using communication facilities to effectuate the conspiracy. In sentencing Giry to 20 years' imprisonment and a $200,000 fine on the con-

spiracy count, the district court relied on a legislative amendment to the relevant penalty statute, 21 U.S.C. section 960(b)(1). The amendment was enacted on October 12, 1984, almost ten months after the first meeting among the appellants and the DEA agents, but almost four months prior to Giry's arrest. Because Giry's sentence exceeded the maximum penalties allowed by the unamended version of the statute, Giry argues that his sentence is prohibited by the *ex post facto* clause of the constitution, Article I, Section 9, cl. 3. We find no merit in this argument.

A conspiracy to commit a substantive offense proscribed by subchapter II of the Drug Abuse Prevention and Control Act, 21 U.S.C. sections 951–966, is punishable by the same penalties applicable to the substantive offense that forms the conspiracy's object, 21 U.S.C. section 963. Having been convicted for conspiracy to import cocaine, Giry was subject to sentencing under 21 U.S.C. section 960(b)(1), which prescribes penalties for, among other offenses, the importation of cocaine. Prior to its amendment on October 12, 1984 section 960(b)(1) set the maximum penalty at imprisonment for fifteen years and/or a fine of $25,000. As amended, the statute raised these maxima for certain drug offenses to imprisonment for twenty years and/or a fine of $250,000. The importation of a kilogram or more of cocaine was one of the offenses covered by these enhanced penalties, *see* 21 U.S.C. section 960(b)(1)(B).[1]

Giry's sentence on the conspiracy count falls within the maxima allowed by the amended version of the penalty statute. The only question is whether a statutory amendment that becomes effective during the running time of a conspiracy is applica-ble to members whose participation in the conspiracy began before that date. Giry's contention that such application of the amendment violates the constitution rests on an overexpansive reading of the *ex post facto* clause. The *ex post facto* clause prohibits any law "which makes more burdensome the punishment for a crime, *after* its commission," *Beazell v. Ohio*, 269 U.S. 167, 169, 46 S.Ct. 68, 68, 70 L.Ed. 216 (1925), *quoted in Dobbert v. Florida*, 432 U.S. 282, 292, 97 S.Ct. 2290, 2298, 53 L.Ed.2d 344 (1977) (emphasis added). Here, by contrast, the amendment had the effect of increasing Giry's penal liability *during* the conspiracy's commission. "[B]ecause conspiracy is a continuing crime, a statute increasing the penalty for a conspiracy beginning before the date of enactment but continuing afterwards does not offend the Constitution," *United States v. Baresh*, 790 F.2d 392, 404 (5th Cir.1986); *see also United States v. Campanale*, 518 F.2d 352, 365 (9th Cir.1975), *cert. denied*, 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 638 (1976) ("It is well established that a statute increasing a penalty with respect to a criminal conspiracy which commenced prior to, but was continued beyond the effective date of the statute, is not *ex post facto* as to that crime."). We therefore find no *ex post facto* clause violation in Giry's sentencing.

The judgments of conviction and sentences entered by the district court are affirmed.

---

1. In their reply brief, the appellants cite section 960(b)(1)(A) for the proposition that the enhancement provision expressly excludes crimes involving coca leaves, reply brief at 13. Subsection (b)(1)(A) makes the enhanced penalties applicable to drug offenses involving "100 grams or more" of all Schedule I and II controlled substances "other than a narcotic drug consisting of (i) coca leaves...." Subsection (b)(1)(B) makes the enhanced penalties applicable to drug offenses involving "a kilogram or more of any other narcotic drug in Schedule I or II." Cocaine and other coca leaf derivatives are Schedule II controlled substances, *see* 21 U.S.C. section 812(c), Schedule II, (a)(4). The combined effect of subsections (b)(1)(A) and (b)(1)(B) is to distinguish coca leaf derivatives from other Schedule I and II drugs with respect to the quantity threshold that triggers the enhanced penalties: a kilogram is required for cocaine and other coca leaf derivatives, whereas 100 grams suffices for the other Schedule I and II drugs. Here, the appellants were convicted of conspiracy to import 135 kilograms of cocaine, which far exceeds the relevant quantity threshold for enhanced penal liability.