USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT ____________________ No. 92-2018 UNITED STATES, Appellee, v. RAYMOND MORENO, JR., Defendant, Appellant. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Robert E. Keeton, U.S. District Judge] ___________________ ____________________ Before Breyer, Chief Judge, ___________ Torruella and Boudin, Circuit Judges. ______________ ____________________ Lawrence P. Murray with whom Henry F. Owens, III and Owens & ___________________ ____________________ ________ Associates were on brief for appellant. __________ Ralph F. Boyd, Jr., Assistant United States Attorney, with whom __________________ A. John Pappalardo, United States Attorney, and Michael J. Pelgro, _ _________________ __________________ Assistant United States Attorney, were on brief for appellee. ____________________ May 6, 1993 ____________________ BOUDIN, Circuit Judge. Defendant Raymond Moreno, Jr., _____________ appeals his conviction in the district court for possession of an unregistered firearm, 26 U.S.C. 5861(d), and of ammunition by a convicted felon, 18 U.S.C. 922(g)(1). Moreno argues that evidence was lacking to support the verdict; that the court erred in admitting what he characterizes as evidence of "prior bad acts;" and that comments by the prosecutors to the jury deprived him of a fair trial. For the reasons that follow, we affirm Moreno's convictions. I. Moreno first argues that the evidence introduced at trial was insufficient. Our inquiry is a limited one: to decide whether there was evidence from which a rational trier of fact could have concluded beyond a reasonable doubt that Moreno possessed the firearm and the ammunition. Legitimate inferences must be drawn, and credibility determinations resolved, in favor of the verdict. See United States v. ___ _________________ Anguilo, 897 F.2d 1169, 1197 (1st Cir.), cert. denied, 111 S. _______ ____ ______ Ct. 130 (1990). From the government's evidence at trial (Moreno presented no evidence of his own), a reasonable jury could have found the following. On the evening of April 18, 1991, a group of five law enforcement officers, while on foot patrol in the Lenox Street Housing Development in Boston, -2- -2- Massachusetts, heard a series of gunshots coming from another area within the development. Three of the officers, Officers Garvey, Perkins and Devane, ran in the direction of the shots; the other two, Officer Murphy and Trooper Drummy, returned to their parked cruisers. As the three officers were running down Hammond Street in the direction of the shots, they observed three black males, all wearing black hooded sweatshirts or jackets, emerge from a courtyard in the direction of the gunshots, run across Hammond Street and disappear near a cluster of buildings across the street. One of the officers described the three men as running in a line in a "hunched over" manner. There was only the briefest interval when the defendants together disappeared from view. Almost at once, two of the three officers, joined by Officer Murphy (who had left his cruiser to assist in the foot pursuit), saw the same three men running through a parking lot behind the cluster of buildings, and gave chase. The officers then saw one of the three men veer off from the other two and run in a separate direction. The second and third men were then seen by the officers to come together briefly and appeared to pass an object between them. Officer Murphy, who was closest to the two individuals, described the item being exchanged as a dark object about one to one-and-a- half feet long. The individual who took this object then ran -3- -3- off through a grass courtyard. The individual who passed on the object immediately stopped, raised his arms and surrendered. That individual was later identified as the defendant, Raymond Moreno, Jr. Officer Garvey, in order to cut off any escape route, had circled around to the opposite end of the grass courtyard. Officer Garvey soon saw a black male wearing a black hooded sweatshirt enter the courtyard from the area in which Moreno had just been arrested. After telling the man several times to stop, Officer Garvey saw the man make a gesture as if to throw an object aside, and then heard a soft thud on the ground nearby. The man was arrested and identified as Frederick Hardy, who was tried and convicted along with Moreno but is not a party to this appeal. A search of the area revealed a .32 caliber pistol about five to eight feet from where Hardy stopped and made the throwing gesture. When arrested, Hardy was not in possession of the foot- long object that the officers had seen him receive from Moreno. The officers then searched the path between the area of Moreno's arrest and the spot at which Officer Garvey first observed Hardy. Hidden in bushes along that direct route, the officers found a double-barrelled sawed-off shotgun with a 12 1/2 inch barrel, fully loaded with ammunition. This is -4- -4- the firearm and ammunition which Moreno is charged in this case with having possessed. While Moreno and Hardy were being arrested, Officer Devane was in search of the first of the three runners, who had gone off in a separate direction. Officer Devane discovered a black male, sweating and out of breath and wearing a black hooded sweatshirt, hiding in some bushes. After arresting the individual and placing him in a cruiser, Officer Devane found a semi-automatic pistol on the ground near where the individual had been hiding. The pistol was in the lock-back position, smelled of gunpowder, and was out of ammunition, indicating that it recently had been discharged. The arrested individual was identified as Steven Fernandes. Several officers then went back to a central courtyard in the middle of the Lenox Housing Development. This courtyard was in the general area of the gunshots, and it was immediately accessible from the spot where the three arrested men were first observed by the officers. In the courtyard, the officers found discharged cartridge casings. These spent casings were matched by a ballistics expert to the pistol that was found next to Stephen Fernandes. At the police station after his arrest, Moreno, after receiving his Miranda warning, denied knowing either Hardy or _______ Fernandes. He claimed that he had been standing alone in the housing development when he heard shots and started running. -5- -5- At trial, however, a resident of the housing development testified that he had seen Moreno together with Hardy and Fernandes a number of times over the prior year. In addition, Officer Dreary of the Boston Police testified that in March 1991 he stopped a red Isuzu Trooper; Hardy was the driver and Moreno was a passenger in the front seat. We think a reasonable jury could conclude beyond a reasonable doubt from this evidence that Moreno possessed the sawed-off shotgun and its ammunition. Officer Perkins testified that he "saw [the two men] meet and . . . could see them having some kind of exchange," but he was not close enough to describe the object. Officer Murphy, who was closer to the men, did observe the object--which he described as "about a foot and a half [long]" and "dark in color." It was found directly in the path Hardy took after the exchange with Moreno, prior to his apprehension by Officer Garvey. Once the police testimony is credited, Moreno is effectively tied to the loaded shotgun. The direct evidence as to the shotgun was reinforced by other evidence. First, Moreno and the individuals seen running away were fleeing from an area in which shots had been fired--shots that the jury could infer had been fired by one of the group, since a pistol belonging to one of the three matched shell casings found in the area of the gunshots. Second, Moreno's false denial after his arrest of -6- -6- a prior relationship with Hardy and Fernandes suggests a guilty mind and helps rebut any inference that he was merely in wrong place at wrong time. The direct evidence, bolstered by these secondary inferences, was more than enough to support the jury's verdict. II. Next, Moreno argues that the trial court committed error by allowing the government to introduce evidence of the gunshots heard by the officers prior to Moreno's arrest, the semi-automatic pistol found with Fernandes and the spent shell casings matching that pistol. Describing the evidence as proof of "other crimes" under Fed. R. Evid. 404(b), Moreno argues that this evidence related only to his character or propensity to commit crime rather than to any legitimate issue in the case. Rule 404(b) provides that evidence of "other crimes, wrongs or acts" is not admissible to prove "the character of a person in order to show action in conformity therewith." Such evidence is not prohibited, however, if offered for "other purposes." Fed. R. Evid. 404(b). See United States v. Rodriguez-Estrada, 877 F.2d 153 ___ __________________________________ (1st Cir. 1989). In this case, the government's evidence of the gunshots, Fernandes' pistol, the matching spent ammunition, and Hardy's weapon supports a chain of inferences independent of any tendency of the evidence to show bad character. The evidence -7- -7- permits the inference that Fernandes, with Hardy and Moreno in attendance, was the individual who discharged the gunshots, and that the three men were running together from the scene of that discharge when first observed by the officers. In turn, the facts that Fernandes and Hardy were armed and that the three men were fleeing together after Fernandes had discharged three rounds of ammunition made it somewhat more likely that the object Moreno was seen to pass along to Hardy was indeed the shotgun later found nearby. See, e.g., United States v. Currier, 821 F.2d 52, 55 (1st ___ ____ ______________ _______ Cir. 1987) (the proffered evidence of other bad acts was "closely intertwined with the charged offense of possession, providing both significant contextual material and proof that the defendant possessed the gun"). An example may be of help in understanding the inference. If a defendant were charged with shooting a guard in the course of a bank robbery, it would surely be permissible to show that he was caught fleeing from the scene of a just-robbed bank with two other persons who both possessed weapons. The defendant could certainly argue to the jury that he was an innocent bystander who was fleeing from a dangerous scene. But the fact of the bank robbery and the possession of the weapons by others arguably associated with the defendant would surely be relevant evidence that the jury could consider along with other evidence against the -8- -8- defendant. If the other evidence included some eyewitness testimony that the defendant had run with the others and had appeared to be carrying a weapon, the facts would not be far from our case. Indeed, not only are the gun shots and other weapons relevant to the government's case against Moreno but the ordinary risks presented by Rule 404(b) evidence are especially tame in this case. The hand-guns were not found with Moreno but with other defendants and the gun shots were apparently fired by Fernandes. In other words the evidence suggested "other crimes" not by Moreno but by Fernandes and Hardy. The usual taint of "other crimes" evidence--the risk that the jury will think the defendant a bad man because he committed other crimes--was, so far as it threatened Moreno, largely absent. If the jury otherwise thought him an innocent bystander, it had no reason to attribute to him the crimes of Fernandes and Hardy. Of course, if the jury accepted the officers' testimony, it could conclude that Moreno was not a bystander innocently fleeing from danger but rather was associated with the other defendants, had run with them, had handed off his own weapon ____ to Hardy, and had after his arrest falsely denied knowing the other two. If so, the evidence of gunshots furnished the occasion and context for the flight by all three defendants; and the weapons possessed by the other two made it more -9- -9- likely, if only slightly, that Moreno too might be armed. At least the jury was entitled to consider the evidence of gunshots and other weapons and draw such inferences if it chose to do so. In short, the evidence was clearly admissible on a theory entirely separate from any light it might cast upon Moreno's "character." Whether the relevance of such evidence is substantially outweighed by its prejudicial effect is a judgment largely within the broad discretion of the trial judge. Fed. R. Evid. 403; United States v. Simon, 842 F.2d _____________ _____ 552, 553 (1st Cir. 1988). A defendant is entitled on request to a limiting instruction, warning the jury not to draw the forbidden inference of bad character. Fed. R. Evid. 105. Moreno's counsel in this case did not seek such an instruction, requesting only a far broader one to which he was not entitled.1 III. The most troubling aspect of this appeal concerns statements made by the government during argument to the jury. In his opening remarks, the prosecutor stated, "[T]he evidence will show that [the police officers] were doing ____________________ 1Asked what limiting instruction he would like, Moreno's counsel asked for one telling the jury that evidence of Fernandes' pistol and the spent shell casings "is not to be considered against the case of Mr. Moreno" or "in no way can be used by this jury" against Moreno. Since the evidence could properly be used against Moreno, the district court quite properly refused this instruction. -10- -10- their jobs protecting the community that has been plagued by violence, senseless violence, shootings and killings. That's why they were there and that's why we're here today." There was, of course, no evidence in this case of "senseless violence" or "shootings and killings," and it was patently improper for the prosecutor to make these remarks to the jury. The argument, playing upon the jury's emotional reaction to neighborhood violence, was outside the bounds of legitimate argument and cannot be condoned. See United ___ ______ States v. Johnson, 952 F.2d 565, 574 (1st Cir. 1991) ______ _______ (admonishing "prosecutorial commentary serving no purpose other than to inflame the passions and prejudices of the jury, and to interject issues broader than the guilt or innocence of the accused" (citations and internal quotations omitted)), cert. denied, 113 S. Ct. 58 (1992). ____ ______ We do not believe, however, that reversal is warranted. The experienced trial judge, who was in the best position to appraise the prejudicial impact of the prosecutor's remark, thought a curative instruction the correct remedy. When objection was made, at the end of the prosecutor's opening, the trial judge forcefully cautioned the jury: I must give you some instructions to disregard some of the things that were said in the opening statement. There were references to violence in the area, to other incidents in the area than those that are the subject matter of this trial. I will instruct you to disregard all of those references. Some were made very early in the opening statement, others were made in the course of it and toward the -11- -11- end of the opening statement. We are here to try on the evidence with respect to the charges against these defendants, only the charges against these defendants. It is not your function or the function of the court or anyone else to be concerned about anything other than the charges against these defendants and the evidence bearing upon that. You will erase from your mind the arguments about other violence, and the phrase "senseless killings" was used. Those are not matters to be considered by you as you weigh and evaluate the evidence that relates to this case. We think that this powerful and contemporaneous instruction was adequate to dispel any prejudice caused by the prosecutor's remarks. See United States v. Giry, 818 F.2d ___ ______________________ 120, 134 (1st Cir.), cert. denied, 484 U.S. 855 (1987). ____ ______ What is no less disturbing is that, even after the warning embodied by this instruction, the prosecutor again departed from the straight and narrow in his closing. In the course of arguing that the shotgun was not just tossed away but deliberately concealed, the prosecutor--apparently carried away--continued: "Forget about the fact that maybe Mr. Hooker [who lived nearby] or his wife or his three kids might come out and look at the gun and get their heads blown off." The court then gave a lengthy curative instruction, and the case proceeded. The curative instruction was rather oblique on this issue but it was lengthy, and we are -12- -12- satisfied that the jury got the message to ignore what had just been said.2 If we thought that this second foray was deliberate, there might well be a basis for reversal as a deterrent for the future, see United States v. Capone, 683 582, 586 (1st ___ _____________ ______ Cir. 1982), even though this remark did not directly relate to Moreno for nothing in the evidence suggested that Moreno had carelessly concealed the weapon where Mr. Hooker or his family might find it; that was the act of another defendant. In context, however, the prosecutor's remark does not appear to have been a deliberate disregard of the court's earlier, implied warning. Rather, although improper it was seemingly a sudden expression of indignation at the tail-end of a legitimate larger point. Finally, in appraising possible prejudice, we do not ignore the fact that the case against Moreno was ample. As we said in Giry, 818 F.2d at 133, "prejudice that survives ____ the charge is deemed less likely to have affected the outcome of the trial where strong evidence supports the prosecution's case". Here, both judges who join in this majority opinion have independently reviewed the transcripts of the trial testimony in this case, in addition to the briefs; and both ____________________ 2The judge was, at the same time, cautioning the jury to give no weight to any personal opinions expressed by the prosecutor, then or earlier. After completing the curative instruction, the judge gave the lawyers the opportunity to ask for more, and neither requested any addition. -13- -13- are satisfied that the case against Moreno was quite strong and that the objectionable remarks, in context and in light of the instructions given by the trial judge, would not have swayed the jury. As the evidence already recited shows, Moreno was directly identified by two police officers as running from the area after gunshots. He was seen by one of the officers to hand over a foot-long object to a second man, and the sawed-off shotgun in question was found near the path where the third one had run shortly before he too was apprehended. This evidence was coupled with other evidence showing the possession of weapons by Moreno's companions, their flight together with Moreno, and Moreno's denials that he knew the other two--denials proved to be false by two different witnesses. The trial of this relatively simple case stretched over 10 days. The trial time was devoted entirely to government evidence, since the defendants did not testify and presented no witnesses of their own. The government put on 21 witnesses, including five officers who were present at the time that Moreno was pursued and whose key testimony has been summarized above. We also note that, although this does not excuse the government's missteps, defense counsel made arguments before the jury that were not beyond criticism, including cross-examination inappropriately injecting racial -14- -14- issues into the case. In sum, the government's case was substantial and the imperfections in counsel's rhetoric were not all on one side. On balance, we are convinced that the prosecutor's missteps did not deprive Moreno of a fair trial or a just outcome. The prosecutor's improper remarks were by and large aberrations, met by prompt countervailing instructions, in a 10-day trial that was otherwise consumed by a detailed exposition of the events of April 18, 1991. This court has found that even more objectionable statements by prosecutors did not warrant reversal where a corrective instruction was given, e.g., Giry, 818 F.2d at 120 (argument ____ ____ comparing charged drug offenses to an "agree[ment] to kill the judge"), or no timely objection was made, e.g., United ____ ______ States v. Machor, 879 F.2d 945, 955 (1st Cir. 1989) (drugs ______ ______ "poisoning our community, and our kids die because of this"), cert. denied, 493 U.S. 1094 (1990). The district court acted ____ ______ within its discretion in this case in concluding that the prosecutor's misstatements did not so "poison[] the well" as to require a new trial. United States v. Mejia-Lozano, 829 ______________________________ F.2d 268, 274 (1st Cir. 1987).3 ____________________ 3We have reviewed the other remarks of the prosecutor objected to by Moreno, including the distinct claims that the prosecutor disparaged defense counsel and engaged in improper expressions of personal belief. In some instances, we think the prosecutor made permissible arguments and in others, all milder than the two discussed in text, we think the curative instructions given were adequate. -15- -15- Nevertheless, for the sake of future cases, we think this worth saying: inflammatory comments to the jury are not only bad tactics in the case at hand but, especially if repeated after warnings, will exhaust the patience of the court and gradually undermine the reputation of the prosecutor's office. Trials, to be sure, are hard fought contests where not every remark can be carefully weighed. But for the government in a criminal case, fairness is more important than victory. Although we view the evidence as far more substantial than does our dissenting colleague and have some (but not blind) faith in corrective instructions, the government would do well to take this warning seriously. Affirmed. ________ -16- -16- TORRUELLA, Circuit Judge (Dissenting). With all due respect _____________ to my esteemed colleagues in the majority, I must dissent. I do so reluctantly because although I disagree with their characterization of the strength of the evidence against Moreno, see ante at 13, I agree that in all probability the jury verdict ___ ____ would have been the same sans the breaches committed during the ____ trial. My reticence, however, is not sufficient to overcome my perturbation at what I perceive to be the virtual condonation, with nary but mild admonitions on our part, of repeated prosecutorial transgressions, almost to the point of a pattern. See, e.g., United States v. Agudelo, No. 90-1465, 1993 U.S. App. ___ ____ _____________ _______ LEXIS 4970 (1st Cir. March 18, 1993) (admission of improper testimony); United States v. Williams, 985 F.2d 634 (1st Cir. _____________ ________ 1993) (admission of improper evidence); United States v. Smith, ______________ _____ 982 F.2d 681 (1st Cir. 1993) (improper argument by prosecutor); United States v. Hodge-Balwing, 952 F.2d 607, 611 (1st Cir. 1991) _____________ _____________ (improper argument by prosecutor). The majority itself points out similar cases falling within this pattern, but fails to appreciate the extent of its perniciousness. See ante at 14 ___ ____ (citing Machor, supra, and Giry, supra, as examples of "fierce" ______ _____ ____ _____ arguments by prosecutors). Compounding this problem is the fact that Rule 404(b) and the harmless error doctrine have been converted, not to say subverted, into a wall behind which the Government apparently can continue ad infinitum to take pot shots ____________ with impunity. -16- -16- I register my protest because our past cautions, timid as they were, see, e.g., Agudelo, slip op. at 6 n.7 ("this is not to ___ ____ _______ forget our complaint . . . about giving the government two bites at the apple: push for evidence believed to be damning, and then say it was meaningless"); Williams, slip op. at 8-9 ("to infect ________ and jeopardize a prosecution with such evidence is unwise and unjustifiable"), have not only been ignored, but alas, have probably encouraged this continued conduct. I fear that the current warning, ante at 15, although somewhat more forceful than ____ those that have come before, is likely to further erode our institutional credibility, if the past is any indication of the future. More importantly, I believe that the prosecutor's actions in the present case unconstitutionally prejudiced Moreno's right to a fair trial. To set the trial in proper perspective, a review of the facts is appropriate. Three unidentified persons were seen running from the sound of gunfire; at some point thereafter one of these persons appeared to pass a one to one-and-one-half foot ________ long dark object to another person who kept on running with the unknown object; the passer then stopped running, was arrested (we know not for what crime at this point), and eventually was identified as Moreno; a person later identified as Frederick Hardy, the receiver of the unknown object, was intercepted and arrested coming from where Moreno was detained; Hardy was seen throwing away an object, which was later recovered and which turned out to be a .32 caliber pistol; no other weapon was found -17- -17- on or near Hardy, but a search of his suspected route revealed a loaded, double barrel, sawed off shotgun, hidden in the bushes along the direct path from where Moreno was arrested; this shotgun and its ammunition are the weapons with which Moreno is charged with illegally possessing. At trial, the prosecutor introduced as Rule 404(b) evidence against Moreno a third weapon found elsewhere in the possession _____ _________ of a third individual, Stephen Fern ndes. This weapon was a 9 _____ mm. caliber pistol, as well as 10 casings fired from that weapon at the scene of the original shooting. The prosecutor also made improper statements, which fall into three groups, at different points. First, he linked appellant to the rampant violence in the community, insisting at opening argument that "the evidence will show that [the police] were doing their jobs protecting the community that has been plagued by violence, senseless violence, shootings and killings." He continued "[t]hat's why they were there and that's why we're here today." The prosecutor referred to the officers as members of an anti-gang unit on four occasions, and instructed the jury not to "reward" the defendants for discarding weapons. The prosecutor injected violence at every opportunity, stating, for example, that "[i]f you're walking down the street with a baseball bat, it's not illegal to possess it. If you use the baseball bat to bash in somebody's head, that's illegal," and that "Mr. Hooker or his wife orhis three kids might come out and look at the gun and get their heads blown off." In describing -18- -18- the shotgun, which had not been fired, the prosecutor argued "[s]omebody had to move that lever, crack open that barrel and put those two shotgun shells into the shotgun. Somebody does that for a reason. Just remember that these three people armed themselves with three guns." The prosecutor proceeded "[a]ll you had to do was pull the trigger. Think about going into the middle of that housing development armed with those weapons together and firing one of these weapons." Second, the prosecutor improperly vouched for the government witnesses, intimating that they possessed some information beyond the evidence presented. In discussing the "cylindrical object" that appellant passed on to another individual, the prosecutor warranted that the police "knew what it was, but they're not overstating their testimony." He later asserted "[t]hey knew what the object was. They were going to find it." Third, the prosecutor urged the jury to disregard appellant's counsel because defense attorneys "are paid to see see [sic] things in a different way." Furthermore, the prosecutor contended at one point that defense counsel was "talking out of both sides of his mouth." The prosecutor, discussing a defense argument, explained "I'm not quite sure what that meant, but I would suggest that a part of it was designed to divert your attention." As the majority points out, the prosecution's statement appealing to the jury's fear of neighborhood violence was "patently improper" and "outside the bounds of legitimate -19- -19- argument and cannot be condoned." Id. at pp. 10-11. "[N]o less ___ disturbing," finds the majority, is that "even after [being warned] the prosecutor again departed from the straight and narrow in his closing." Id. at 12. This would have been ___ sufficient basis for "reversal as a deterrent," the majority tells us, only if "this second foray [had been] deliberate." Id. ___ This observation is irrelevant if the prosecutor's statements caused harm to defendant, and harm undoubtedly was caused by these and other statements. My colleagues place too much faith on the practical value of the curative instructions given by the trial judge, the second of which was admittedly "rather oblique" as to the matter objected.4 Id. at 12; see also United States v. Akinola, No. ___ ________ ______________ _______ 92-1587 (1st Cir. Feb. 2, 1993) ("it is the combination of the trial judge's instructions . . . that would render the prosecutor's putative violation harmless"). Empirical studies have established that juries tend to consider relevant evidence in a case even when it is ordered stricken from the record. See ___ Reid Hastie, Steven D. Penrod and Nancy Pennington, Inside the ___________ Jury 87, 231 (1983). In fact, juries are even more likely to ____ consider such evidence if admonished by the court not to consider it, than if no specific instruction is given. See Saul Kassin ___ ____________________ 4 The majority indicates that they "are satisfied that the jury got the message to ignore what had just been said." Id. at 12. ___ I would ask rhetorically what there is in the instruction to cause such reassurance. Certainly nothing in its obliqueness, and I would think, little in its length would commend such a conclusion. -20- -20- and Lawrence Wrightsman, The American Jury On Trial: __________________________________ Psychological Perspectives 108-09 (1988). Even more troublesome __________________________ to a criminal defendant in Moreno's position are the studies indicating that juries tend to forget the source of the information they remember, and are often unable to recall whether the source of information came from a witness, or from one of the attorneys during the opening statement or closing argument. Id. ___ at 106. These studies also show that juries treat statements made by counsel in opening statements as fact even though no evidence is later introduced to support the attorney's assertion. Id. Harmful impact may also result from improper remarks in an ___ opening statement, caused by a psychological phenomenon known as the "primacy effect," which is a tendency to make snap judgments based on information presented early in the trial. Id. at 134. ___ Once jurors form a first impression, they often discount or reject facts that challenge their views, and instead fill their trial memories in ways that favor their initial reaction. Id. at ___ 134-35; see also N. Anderson, Foundations of Information _________ _____________________________ Integration Theory 179-81 (1981). __________________ Our cases repeatedly have ignored the practical effect of improper argument and evidence on the jury by excusing such impropriety as harmless error and then chiding the prosecutor. See, e.g., Agudelo, supra; Williams, supra; Hodge-Balwing, 952 at ___ ____ _______ _____ ________ _____________ 611 ("we review only 'blockbusters: those errors so shocking that they seriously affect the fundamental fairness and basic integrity of the proceedings conducted below'"). The studies -21- -21- discussed above clearly demonstrate a common sense conclusion with empirical data: the prejudicial influence of such argument and evidence should not be easily disregarded in the manner we have done, as it flows more deeply than we have assumed.5 The studies lead to one inescapable conclusion in regard to this case: there is no way of knowing if the stricken remarks were in fact not influential in prejudicing the jury in a powerful and lasting way, and thus tipping the balance against him. To this prejudice we add the impact on the jury of the so- called 404(b) evidence. This evidence proffered under the aegis of this rule consisted of: (1) testimony that pistol shots fired ______ by unknown persons were heard by police officers prior to _______ Moreno's arrest; (2) a 9 mm. caliber pistol that was found on the ______ ground near another individual; and (3) ten spent shell casings _______ matching that pistol, which were found near area from which ______ Moreno and three other men were seen running from after the shots were heard. As noted, supra at 15, the 9 mm. pistol was found in _____ possession of a third person, Stephen Fern ndes, who was not even tried together with appellant. All this evidence was allowed as probative in establishing "other crimes, wrongs or acts," by __ ____________________ 5 Thus, the "powerful and contemporaneous instruction" referred to by the majority, ante at 11, was indeed such, but not as ____ intended. It served to remind the jury "about other violence" and senseless killings. Id. ___ Indeed, these studies starkly reveal the dilemma that attorney's face in this area of the law. They must choose either to ask for a curative instruction, increasing the impact of the improper argument or evidence, or remain silent, in which case they waive the issue on appeal, see United States v. Tejeda, 974 ___ _____________ ______ F.2d 210, 215 (1st Cir. 1992). -22- -22- Moreno, with regard to charges that he illegally possessed a ______ __ loaded sawed-off shotgun. This is claimed to be evidence __________________________ unrelated to Moreno's character or propensity to commit crime and thus admissible for nebulous "other purposes." Fed. R. Evid. 404(b). This is clearly improper use of Rule 404(b). The evidence was not even proof of wrongful acts by Moreno, but, at best, _________ evidence of other wrongful acts by third persons in Moreno's _________________ presence. Because Rule 404(b) should only be invoked when prosecutors seek to introduce evidence of prior bad acts committed by the defendant, it is error to analyze this evidence under that rule. United States v. Moccia, 681 F.2d 61, 63 (1st _____________ ______ Cir. 1982) (Breyer, C.J.) (Rule 404(b) forbids prosecution from "asking the jury to infer from the fact that the defendant has _____________ committed a bad act in the past, that he has a bad character and therefore is more likely to have committed the bad act now charged") (emphasis added). The proper inquiry is whether the evidence is relevant, and whether it is more prejudicial than probative. The correct answer to the first question is no, and the answer to the second is yes. At best the evidence shows mere presence during the commission of other crimes by other persons. It asks the jury to ____________ _____________ conclude that appellant somehow was guilty of that crime, and by extension, guilty of the current crime. Appellant's mere presence at the scene of that crime, of course, does not establish appellant's guilt of that crime. See United States v. ___ _____________ -23- -23- Aponte-Su rez, 905 F.2d 483, 491 (1st Cir.) (mere presence at the _____________ scene of a crime and knowledge that a crime was to be committed is not proof of guilt), cert. denied, 498 U.S. 990 (1990); see ____________ ___ also Nye & Nissen v. United States, 336 U.S. 613, 619 (1949). ____ _____________ _____________ Furthermore, and with all due respect, concluding that persons present at the scene of a shooting, and thereafter fleeing, are more likely to be carrying weapons is highly illogical. It is just as likely that persons fleeing the scene of a shooting will be either unarmed victims or by-standers, and in fact, it is more probable that they would have more of an incentive to flee, and faster, precisely because they were unarmed. Thus, the inference __ that it is more likely that appellant is guilty of the felon-in- possession crime because he was fleeing from the scene of another crime committed by other persons is insupportable. The evidence is constitutionally and factually irrelevant. Even if the evidence was relevant, its probative value pales in comparison to its prejudicial effect. Any probative value that the evidence may have stems from extended inferences and speculation about the probabilities of people carrying weapons. Inferences and speculation, however, are infected too easily in this case by the transference of guilt from the shooting of a gun by a third party to the charged crime of possession, ensuring that a jury will draw all doubt against appellant. See United ___ ______ States v. St. Michael's Credit Union, 880 F.2d 579, 602 (1st Cir. ______ __________________________ 1989) (danger that jury might convict defendant on theory of guilt by association). When added to the impact of the -24- -24- prosecutor's improper argument concerning senseless killings and community violence, the prejudicial impact becomes manifest. The majority opinion chooses to ignore the prejudicial effect of this evidence, concluding that the defense somehow waived any consideration of the issue. Lastly, let us return to the trial itself, and consider the overall impact of these breaches. I have already conceded that even without the Rule 404(b) evidence, appellant probably would not withstand a Rule 29 motion. The evidence concerning the cylindrical object and the shotgun is perfectly valid, and one can conclude that the charged possession of a shotgun in fact occurred from it. The conclusion can only be reached through extended inferences, though, because no witness testified that they actually saw Moreno with the weapon, but only that he passed something to someone who was later found nearby the weapon. Given the prejudice already infused into the trial by the improper argument and evidence, I do not see how it can be discounted that the required inferences supporting this conclusion were not themselves infected. In all likelihood this prejudice would make the jury more predisposed to draw the required inferences against appellant, thus tipping the balance against him. What we have here is a vulnerable case requiring the jury to make substantial inferences in order to convict. The prosecution beefed up its case by clearly improper statements at crucial stages of the trial, and threw in pseudo 404(b) evidence for good -25- -25- measure. Although the defendant did not create this situation, he is asked to assume all the risks it generates. Somehow this is not my idea of a fair trial. It contradicts all logic and practical experience. It is past due that this court send a clear message regarding the standards that are expected of a litigator whose motto is that "[t]he United States wins its point whenever justice is done its citizens in the courts." It is better that this message be given in this case than in a case of more societal consequence. This appellant did not get a just trial. A new one should be ordered. -26- -26-