UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 92-2018

UNITED STATES,

Appellee,

v.

RAYMOND MORENO, JR.,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Robert E. Keeton, U.S. District Judge]

Before

Breyer, Chief Judge,

Torruella and Boudin, Circuit Judges.

Lawrence P. Murray with whom Henry F. Owens, III and Owens &

Associates were on brief for appellant.

Ralph F. Boyd, Jr., Assistant United States Attorney, with whom

A. John Pappalardo, United States Attorney, and Michael J. Pelgro,

Assistant United States Attorney, were on brief for appellee.

May 6, 1993

BOUDIN, Circuit Judge. Defendant Raymond Moreno, Jr.,

appeals his conviction in the district court for possession

of an unregistered firearm, 26 U.S.C. 5861(d), and of

ammunition by a convicted felon, 18 U.S.C. 922(g)(1).

Moreno argues that evidence was lacking to support the

verdict; that the court erred in admitting what he

characterizes as evidence of "prior bad acts;" and that

comments by the prosecutors to the jury deprived him of a

fair trial. For the reasons that follow, we affirm Moreno's

convictions.

I.

Moreno first argues that the evidence introduced at

trial was insufficient. Our inquiry is a limited one: to

decide whether there was evidence from which a rational trier

of fact could have concluded beyond a reasonable doubt that

Moreno possessed the firearm and the ammunition. Legitimate

inferences must be drawn, and credibility determinations

resolved, in favor of the verdict. See United States v.

Anguilo, 897 F.2d 1169, 1197 (1st Cir.), cert. denied, 111 S.

Ct. 130 (1990).

From the government's evidence at trial (Moreno

presented no evidence of his own), a reasonable jury could

have found the following. On the evening of April 18, 1991,

a group of five law enforcement officers, while on foot

patrol in the Lenox Street Housing Development in Boston,

-2-

Massachusetts, heard a series of gunshots coming from another

area within the development. Three of the officers, Officers

Garvey, Perkins and Devane, ran in the direction of the

shots; the other two, Officer Murphy and Trooper Drummy,

returned to their parked cruisers.

As the three officers were running down Hammond Street

in the direction of the shots, they observed three black

males, all wearing black hooded sweatshirts or jackets,

emerge from a courtyard in the direction of the gunshots, run

across Hammond Street and disappear near a cluster of

buildings across the street. One of the officers described

the three men as running in a line in a "hunched over"

manner. There was only the briefest interval when the

defendants together disappeared from view. Almost at once,

two of the three officers, joined by Officer Murphy (who had

left his cruiser to assist in the foot pursuit), saw the same

three men running through a parking lot behind the cluster of

buildings, and gave chase.

The officers then saw one of the three men veer off from

the other two and run in a separate direction. The second

and third men were then seen by the officers to come together

briefly and appeared to pass an object between them. Officer

Murphy, who was closest to the two individuals, described the

item being exchanged as a dark object about one to one-and-a-

half feet long. The individual who took this object then ran

-3-

off through a grass courtyard. The individual who passed on

the object immediately stopped, raised his arms and

surrendered. That individual was later identified as the

defendant, Raymond Moreno, Jr.

Officer Garvey, in order to cut off any escape route,

had circled around to the opposite end of the grass

courtyard. Officer Garvey soon saw a black male wearing a

black hooded sweatshirt enter the courtyard from the area in

which Moreno had just been arrested. After telling the man

several times to stop, Officer Garvey saw the man make a

gesture as if to throw an object aside, and then heard a soft

thud on the ground nearby. The man was arrested and

identified as Frederick Hardy, who was tried and convicted

along with Moreno but is not a party to this appeal. A

search of the area revealed a .32 caliber pistol about five

to eight feet from where Hardy stopped and made the throwing

gesture.

When arrested, Hardy was not in possession of the foot-

long object that the officers had seen him receive from

Moreno. The officers then searched the path between the area

of Moreno's arrest and the spot at which Officer Garvey first

observed Hardy. Hidden in bushes along that direct route,

the officers found a double-barrelled sawed-off shotgun with

a 12 1/2 inch barrel, fully loaded with ammunition. This is

-4-

the firearm and ammunition which Moreno is charged in this

case with having possessed.

While Moreno and Hardy were being arrested, Officer

Devane was in search of the first of the three runners, who

had gone off in a separate direction. Officer Devane

discovered a black male, sweating and out of breath and

wearing a black hooded sweatshirt, hiding in some bushes.

After arresting the individual and placing him in a cruiser,

Officer Devane found a semi-automatic pistol on the ground

near where the individual had been hiding. The pistol was in

the lock-back position, smelled of gunpowder, and was out of

ammunition, indicating that it recently had been discharged.

The arrested individual was identified as Steven Fernandes.

Several officers then went back to a central courtyard

in the middle of the Lenox Housing Development. This

courtyard was in the general area of the gunshots, and it was

immediately accessible from the spot where the three arrested

men were first observed by the officers. In the courtyard,

the officers found discharged cartridge casings. These spent

casings were matched by a ballistics expert to the pistol

that was found next to Stephen Fernandes.

At the police station after his arrest, Moreno, after

receiving his Miranda warning, denied knowing either Hardy or

Fernandes. He claimed that he had been standing alone in the

housing development when he heard shots and started running.

-5-

At trial, however, a resident of the housing development

testified that he had seen Moreno together with Hardy and

Fernandes a number of times over the prior year. In

addition, Officer Dreary of the Boston Police testified that

in March 1991 he stopped a red Isuzu Trooper; Hardy was the

driver and Moreno was a passenger in the front seat.

We think a reasonable jury could conclude beyond a

reasonable doubt from this evidence that Moreno possessed the

sawed-off shotgun and its ammunition. Officer Perkins

testified that he "saw [the two men] meet and . . . could see

them having some kind of exchange," but he was not close

enough to describe the object. Officer Murphy, who was

closer to the men, did observe the object--which he described

as "about a foot and a half [long]" and "dark in color." It

was found directly in the path Hardy took after the exchange

with Moreno, prior to his apprehension by Officer Garvey.

Once the police testimony is credited, Moreno is effectively

tied to the loaded shotgun.

The direct evidence as to the shotgun was reinforced by

other evidence. First, Moreno and the individuals seen

running away were fleeing from an area in which shots had

been fired--shots that the jury could infer had been fired by

one of the group, since a pistol belonging to one of the

three matched shell casings found in the area of the

gunshots. Second, Moreno's false denial after his arrest of

-6-

a prior relationship with Hardy and Fernandes suggests a

guilty mind and helps rebut any inference that he was merely

in wrong place at wrong time. The direct evidence, bolstered

by these secondary inferences, was more than enough to

support the jury's verdict.

II.

Next, Moreno argues that the trial court committed error

by allowing the government to introduce evidence of the

gunshots heard by the officers prior to Moreno's arrest, the

semi-automatic pistol found with Fernandes and the spent

shell casings matching that pistol. Describing the evidence

as proof of "other crimes" under Fed. R. Evid. 404(b), Moreno

argues that this evidence related only to his character or

propensity to commit crime rather than to any legitimate

issue in the case. Rule 404(b) provides that evidence of

"other crimes, wrongs or acts" is not admissible to prove

"the character of a person in order to show action in

conformity therewith." Such evidence is not prohibited,

however, if offered for "other purposes." Fed. R. Evid.

404(b). See United States v. Rodriguez-Estrada, 877 F.2d 153

(1st Cir. 1989).

In this case, the government's evidence of the gunshots,

Fernandes' pistol, the matching spent ammunition, and Hardy's

weapon supports a chain of inferences independent of any

tendency of the evidence to show bad character. The evidence

-7-

permits the inference that Fernandes, with Hardy and Moreno

in attendance, was the individual who discharged the

gunshots, and that the three men were running together from

the scene of that discharge when first observed by the

officers. In turn, the facts that Fernandes and Hardy were

armed and that the three men were fleeing together after

Fernandes had discharged three rounds of ammunition made it

somewhat more likely that the object Moreno was seen to pass

along to Hardy was indeed the shotgun later found nearby.

See, e.g., United States v. Currier, 821 F.2d 52, 55 (1st

Cir. 1987) (the proffered evidence of other bad acts was

"closely intertwined with the charged offense of possession,

providing both significant contextual material and proof that

the defendant possessed the gun").

An example may be of help in understanding the

inference. If a defendant were charged with shooting a guard

in the course of a bank robbery, it would surely be

permissible to show that he was caught fleeing from the scene

of a just-robbed bank with two other persons who both

possessed weapons. The defendant could certainly argue to

the jury that he was an innocent bystander who was fleeing

from a dangerous scene. But the fact of the bank robbery and

the possession of the weapons by others arguably associated

with the defendant would surely be relevant evidence that the

jury could consider along with other evidence against the

-8-

defendant. If the other evidence included some eyewitness

testimony that the defendant had run with the others and had

appeared to be carrying a weapon, the facts would not be far

from our case.

Indeed, not only are the gun shots and other weapons

relevant to the government's case against Moreno but the

ordinary risks presented by Rule 404(b) evidence are

especially tame in this case. The hand-guns were not found

with Moreno but with other defendants and the gun shots were

apparently fired by Fernandes. In other words the evidence

suggested "other crimes" not by Moreno but by Fernandes and

Hardy. The usual taint of "other crimes" evidence--the risk

that the jury will think the defendant a bad man because he

committed other crimes--was, so far as it threatened Moreno,

largely absent. If the jury otherwise thought him an

innocent bystander, it had no reason to attribute to him the

crimes of Fernandes and Hardy.

Of course, if the jury accepted the officers' testimony,

it could conclude that Moreno was not a bystander innocently

fleeing from danger but rather was associated with the other

defendants, had run with them, had handed off his own weapon

to Hardy, and had after his arrest falsely denied knowing the

other two. If so, the evidence of gunshots furnished the

occasion and context for the flight by all three defendants;

and the weapons possessed by the other two made it more

-9-

likely, if only slightly, that Moreno too might be armed. At

least the jury was entitled to consider the evidence of

gunshots and other weapons and draw such inferences if it

chose to do so.

In short, the evidence was clearly admissible on a

theory entirely separate from any light it might cast upon

Moreno's "character." Whether the relevance of such evidence

is substantially outweighed by its prejudicial effect is a

judgment largely within the broad discretion of the trial

judge. Fed. R. Evid. 403; United States v. Simon, 842 F.2d

552, 553 (1st Cir. 1988). A defendant is entitled on request

to a limiting instruction, warning the jury not to draw the

forbidden inference of bad character. Fed. R. Evid. 105.

Moreno's counsel in this case did not seek such an

instruction, requesting only a far broader one to which he

was not entitled.1

III.

The most troubling aspect of this appeal concerns

statements made by the government during argument to the

jury. In his opening remarks, the prosecutor stated, "[T]he

evidence will show that [the police officers] were doing

1Asked what limiting instruction he would like, Moreno's
counsel asked for one telling the jury that evidence of
Fernandes' pistol and the spent shell casings "is not to be
considered against the case of Mr. Moreno" or "in no way can
be used by this jury" against Moreno. Since the evidence
could properly be used against Moreno, the district court
quite properly refused this instruction.

-10-

their jobs protecting the community that has been plagued by

violence, senseless violence, shootings and killings. That's

why they were there and that's why we're here today."

There was, of course, no evidence in this case of

"senseless violence" or "shootings and killings," and it was

patently improper for the prosecutor to make these remarks to

the jury. The argument, playing upon the jury's emotional

reaction to neighborhood violence, was outside the bounds of

legitimate argument and cannot be condoned. See United

States v. Johnson, 952 F.2d 565, 574 (1st Cir. 1991)

(admonishing "prosecutorial commentary serving no purpose

other than to inflame the passions and prejudices of the

jury, and to interject issues broader than the guilt or

innocence of the accused" (citations and internal quotations

omitted)), cert. denied, 113 S. Ct. 58 (1992).

We do not believe, however, that reversal is warranted.

The experienced trial judge, who was in the best position to

appraise the prejudicial impact of the prosecutor's remark,

thought a curative instruction the correct remedy. When

objection was made, at the end of the prosecutor's opening,

the trial judge forcefully cautioned the jury:

I must give you some instructions to disregard some
of the things that were said in the opening
statement. There were references to violence in
the area, to other incidents in the area than those
that are the subject matter of this trial. I will
instruct you to disregard all of those references.
Some were made very early in the opening statement,
others were made in the course of it and toward the

-11-

end of the opening statement. We are here to try
on the evidence with respect to the charges against
these defendants, only the charges against these
defendants. It is not your function or the
function of the court or anyone else to be
concerned about anything other than the charges
against these defendants and the evidence bearing
upon that. You will erase from your mind the
arguments about other violence, and the phrase
"senseless killings" was used. Those are not
matters to be considered by you as you weigh and
evaluate the evidence that relates to this case.

We think that this powerful and contemporaneous instruction

was adequate to dispel any prejudice caused by the

prosecutor's remarks. See United States v. Giry, 818 F.2d

120, 134 (1st Cir.), cert. denied, 484 U.S. 855 (1987).

What is no less disturbing is that, even after the

warning embodied by this instruction, the prosecutor again

departed from the straight and narrow in his closing. In the

course of arguing that the shotgun was not just tossed away

but deliberately concealed, the prosecutor--apparently

carried away--continued: "Forget about the fact that maybe

Mr. Hooker [who lived nearby] or his wife or his three kids

might come out and look at the gun and get their heads blown

off." The court then gave a lengthy curative instruction,

and the case proceeded. The curative instruction was rather

oblique on this issue but it was lengthy, and we are

-12-

satisfied that the jury got the message to ignore what had

just been said.2

If we thought that this second foray was deliberate,

there might well be a basis for reversal as a deterrent for

the future, see United States v. Capone, 683 582, 586 (1st

Cir. 1982), even though this remark did not directly relate

to Moreno for nothing in the evidence suggested that Moreno

had carelessly concealed the weapon where Mr. Hooker or his

family might find it; that was the act of another defendant.

In context, however, the prosecutor's remark does not appear

to have been a deliberate disregard of the court's earlier,

implied warning. Rather, although improper it was seemingly

a sudden expression of indignation at the tail-end of a

legitimate larger point.

Finally, in appraising possible prejudice, we do not

ignore the fact that the case against Moreno was ample. As

we said in Giry, 818 F.2d at 133, "prejudice that survives

the charge is deemed less likely to have affected the outcome

of the trial where strong evidence supports the prosecution's

case". Here, both judges who join in this majority opinion

have independently reviewed the transcripts of the trial

testimony in this case, in addition to the briefs; and both

2The judge was, at the same time, cautioning the jury to
give no weight to any personal opinions expressed by the
prosecutor, then or earlier. After completing the curative
instruction, the judge gave the lawyers the opportunity to
ask for more, and neither requested any addition.

-13-

are satisfied that the case against Moreno was quite strong

and that the objectionable remarks, in context and in light

of the instructions given by the trial judge, would not have

swayed the jury.

As the evidence already recited shows, Moreno was

directly identified by two police officers as running from

the area after gunshots. He was seen by one of the officers

to hand over a foot-long object to a second man, and the

sawed-off shotgun in question was found near the path where

the third one had run shortly before he too was apprehended.

This evidence was coupled with other evidence showing the

possession of weapons by Moreno's companions, their flight

together with Moreno, and Moreno's denials that he knew the

other two--denials proved to be false by two different

witnesses.

The trial of this relatively simple case stretched over

10 days. The trial time was devoted entirely to government

evidence, since the defendants did not testify and presented

no witnesses of their own. The government put on 21

witnesses, including five officers who were present at the

time that Moreno was pursued and whose key testimony has been

summarized above. We also note that, although this does not

excuse the government's missteps, defense counsel made

arguments before the jury that were not beyond criticism,

including cross-examination inappropriately injecting racial

-14-

issues into the case. In sum, the government's case was

substantial and the imperfections in counsel's rhetoric were

not all on one side. On balance, we are convinced that

the prosecutor's missteps did not deprive Moreno of a fair

trial or a just outcome. The prosecutor's improper remarks

were by and large aberrations, met by prompt countervailing

instructions, in a 10-day trial that was otherwise consumed

by a detailed exposition of the events of April 18, 1991.

This court has found that even more objectionable statements

by prosecutors did not warrant reversal where a corrective

instruction was given, e.g., Giry, 818 F.2d at 120 (argument

comparing charged drug offenses to an "agree[ment] to kill

the judge"), or no timely objection was made, e.g., United

States v. Machor, 879 F.2d 945, 955 (1st Cir. 1989) (drugs

"poisoning our community, and our kids die because of this"),

cert. denied, 493 U.S. 1094 (1990). The district court acted

within its discretion in this case in concluding that the

prosecutor's misstatements did not so "poison[] the well" as

to require a new trial. United States v. Mejia-Lozano, 829

F.2d 268, 274 (1st Cir. 1987).3

3We have reviewed the other remarks of the prosecutor
objected to by Moreno, including the distinct claims that the
prosecutor disparaged defense counsel and engaged in improper
expressions of personal belief. In some instances, we think
the prosecutor made permissible arguments and in others, all
milder than the two discussed in text, we think the curative
instructions given were adequate.

-15-

Nevertheless, for the sake of future cases, we think

this worth saying: inflammatory comments to the jury are not

only bad tactics in the case at hand but, especially if

repeated after warnings, will exhaust the patience of the

court and gradually undermine the reputation of the

prosecutor's office. Trials, to be sure, are hard fought

contests where not every remark can be carefully weighed.

But for the government in a criminal case, fairness is more

important than victory. Although we view the evidence as far

more substantial than does our dissenting colleague and have

some (but not blind) faith in corrective instructions, the

government would do well to take this warning seriously.

Affirmed.

-16-

TORRUELLA, Circuit Judge (Dissenting). With all due respect

to my esteemed colleagues in the majority, I must dissent. I do

so reluctantly because although I disagree with their

characterization of the strength of the evidence against Moreno,

see ante at 13, I agree that in all probability the jury verdict

would have been the same sans the breaches committed during the

trial. My reticence, however, is not sufficient to overcome my

perturbation at what I perceive to be the virtual condonation,

with nary but mild admonitions on our part, of repeated

prosecutorial transgressions, almost to the point of a pattern.

See, e.g., United States v. Agudelo, No. 90-1465, 1993 U.S. App.

LEXIS 4970 (1st Cir. March 18, 1993) (admission of improper

testimony); United States v. Williams, 985 F.2d 634 (1st Cir.

1993) (admission of improper evidence); United States v. Smith,

982 F.2d 681 (1st Cir. 1993) (improper argument by prosecutor);

United States v. Hodge-Balwing, 952 F.2d 607, 611 (1st Cir. 1991)

(improper argument by prosecutor). The majority itself points

out similar cases falling within this pattern, but fails to

appreciate the extent of its perniciousness. See ante at 14

(citing Machor, supra, and Giry, supra, as examples of "fierce"

arguments by prosecutors). Compounding this problem is the fact

that Rule 404(b) and the harmless error doctrine have been

converted, not to say subverted, into a wall behind which the

Government apparently can continue ad infinitum to take pot shots

with impunity.

-16-

I register my protest because our past cautions, timid as

they were, see, e.g., Agudelo, slip op. at 6 n.7 ("this is not to

forget our complaint . . . about giving the government two bites

at the apple: push for evidence believed to be damning, and then

say it was meaningless"); Williams, slip op. at 8-9 ("to infect

and jeopardize a prosecution with such evidence is unwise and

unjustifiable"), have not only been ignored, but alas, have

probably encouraged this continued conduct. I fear that the

current warning, ante at 15, although somewhat more forceful than

those that have come before, is likely to further erode our

institutional credibility, if the past is any indication of the

future. More importantly, I believe that the prosecutor's

actions in the present case unconstitutionally prejudiced

Moreno's right to a fair trial.

To set the trial in proper perspective, a review of the

facts is appropriate. Three unidentified persons were seen

running from the sound of gunfire; at some point thereafter one

of these persons appeared to pass a one to one-and-one-half foot

long dark object to another person who kept on running with the

unknown object; the passer then stopped running, was arrested (we

know not for what crime at this point), and eventually was

identified as Moreno; a person later identified as Frederick

Hardy, the receiver of the unknown object, was intercepted and

arrested coming from where Moreno was detained; Hardy was seen

throwing away an object, which was later recovered and which

turned out to be a .32 caliber pistol; no other weapon was found

-17-

on or near Hardy, but a search of his suspected route revealed a

loaded, double barrel, sawed off shotgun, hidden in the bushes

along the direct path from where Moreno was arrested; this

shotgun and its ammunition are the weapons with which Moreno is

charged with illegally possessing.

At trial, the prosecutor introduced as Rule 404(b) evidence

against Moreno a third weapon found elsewhere in the possession

of a third individual, Stephen Fern ndes. This weapon was a 9

mm. caliber pistol, as well as 10 casings fired from that weapon

at the scene of the original shooting.

The prosecutor also made improper statements, which fall

into three groups, at different points. First, he linked

appellant to the rampant violence in the community, insisting at

opening argument that "the evidence will show that [the police]

were doing their jobs protecting the community that has been

plagued by violence, senseless violence, shootings and killings."

He continued "[t]hat's why they were there and that's why we're

here today." The prosecutor referred to the officers as members

of an anti-gang unit on four occasions, and instructed the jury

not to "reward" the defendants for discarding weapons. The

prosecutor injected violence at every opportunity, stating, for

example, that "[i]f you're walking down the street with a

baseball bat, it's not illegal to possess it. If you use the

baseball bat to bash in somebody's head, that's illegal," and

that "Mr. Hooker or his wife orhis three kids might come out and

look at the gun and get their heads blown off." In describing

-18-

the shotgun, which had not been fired, the prosecutor argued

"[s]omebody had to move that lever, crack open that barrel and

put those two shotgun shells into the shotgun. Somebody does

that for a reason. Just remember that these three people armed

themselves with three guns." The prosecutor proceeded "[a]ll you

had to do was pull the trigger. Think about going into the

middle of that housing development armed with those weapons

together and firing one of these weapons."

Second, the prosecutor improperly vouched for the government

witnesses, intimating that they possessed some information beyond

the evidence presented. In discussing the "cylindrical object"

that appellant passed on to another individual, the prosecutor

warranted that the police "knew what it was, but they're not

overstating their testimony." He later asserted "[t]hey knew

what the object was. They were going to find it."

Third, the prosecutor urged the jury to disregard

appellant's counsel because defense attorneys "are paid to see

see [sic] things in a different way." Furthermore, the

prosecutor contended at one point that defense counsel was

"talking out of both sides of his mouth." The prosecutor,

discussing a defense argument, explained "I'm not quite sure what

that meant, but I would suggest that a part of it was designed to

divert your attention."

As the majority points out, the prosecution's statement

appealing to the jury's fear of neighborhood violence was

"patently improper" and "outside the bounds of legitimate

-19-

argument and cannot be condoned." Id. at pp. 10-11. "[N]o less

disturbing," finds the majority, is that "even after [being

warned] the prosecutor again departed from the straight and

narrow in his closing." Id. at 12. This would have been

sufficient basis for "reversal as a deterrent," the majority

tells us, only if "this second foray [had been] deliberate." Id.

This observation is irrelevant if the prosecutor's statements

caused harm to defendant, and harm undoubtedly was caused by

these and other statements.

My colleagues place too much faith on the practical value of

the curative instructions given by the trial judge, the second of

which was admittedly "rather oblique" as to the matter

objected.4 Id. at 12; see also United States v. Akinola, No.

92-1587 (1st Cir. Feb. 2, 1993) ("it is the combination of the

trial judge's instructions . . . that would render the

prosecutor's putative violation harmless"). Empirical studies

have established that juries tend to consider relevant evidence

in a case even when it is ordered stricken from the record. See

Reid Hastie, Steven D. Penrod and Nancy Pennington, Inside the

Jury 87, 231 (1983). In fact, juries are even more likely to

consider such evidence if admonished by the court not to consider

it, than if no specific instruction is given. See Saul Kassin

4 The majority indicates that they "are satisfied that the jury
got the message to ignore what had just been said." Id. at 12.

I would ask rhetorically what there is in the instruction to
cause such reassurance. Certainly nothing in its obliqueness,
and I would think, little in its length would commend such a
conclusion.

-20-

and Lawrence Wrightsman, The American Jury On Trial:

Psychological Perspectives 108-09 (1988). Even more troublesome

to a criminal defendant in Moreno's position are the studies

indicating that juries tend to forget the source of the

information they remember, and are often unable to recall whether

the source of information came from a witness, or from one of the

attorneys during the opening statement or closing argument. Id.

at 106. These studies also show that juries treat statements

made by counsel in opening statements as fact even though no

evidence is later introduced to support the attorney's assertion.

Id. Harmful impact may also result from improper remarks in an

opening statement, caused by a psychological phenomenon known as

the "primacy effect," which is a tendency to make snap judgments

based on information presented early in the trial. Id. at 134.

Once jurors form a first impression, they often discount or

reject facts that challenge their views, and instead fill their

trial memories in ways that favor their initial reaction. Id. at

134-35; see also N. Anderson, Foundations of Information

Integration Theory 179-81 (1981).

Our cases repeatedly have ignored the practical effect of

improper argument and evidence on the jury by excusing such

impropriety as harmless error and then chiding the prosecutor.

See, e.g., Agudelo, supra; Williams, supra; Hodge-Balwing, 952 at

611 ("we review only 'blockbusters: those errors so shocking that

they seriously affect the fundamental fairness and basic

integrity of the proceedings conducted below'"). The studies

-21-

discussed above clearly demonstrate a common sense conclusion

with empirical data: the prejudicial influence of such argument

and evidence should not be easily disregarded in the manner we

have done, as it flows more deeply than we have assumed.5 The

studies lead to one inescapable conclusion in regard to this

case: there is no way of knowing if the stricken remarks were in

fact not influential in prejudicing the jury in a powerful and

lasting way, and thus tipping the balance against him.

To this prejudice we add the impact on the jury of the so-

called 404(b) evidence. This evidence proffered under the aegis

of this rule consisted of: (1) testimony that pistol shots fired

by unknown persons were heard by police officers prior to

Moreno's arrest; (2) a 9 mm. caliber pistol that was found on the

ground near another individual; and (3) ten spent shell casings

matching that pistol, which were found near area from which

Moreno and three other men were seen running from after the shots

were heard. As noted, supra at 15, the 9 mm. pistol was found in

possession of a third person, Stephen Fern ndes, who was not even

tried together with appellant. All this evidence was allowed as

probative in establishing "other crimes, wrongs or acts," by

5 Thus, the "powerful and contemporaneous instruction" referred
to by the majority, ante at 11, was indeed such, but not as

intended. It served to remind the jury "about other violence"
and senseless killings. Id.

Indeed, these studies starkly reveal the dilemma that
attorney's face in this area of the law. They must choose either
to ask for a curative instruction, increasing the impact of the
improper argument or evidence, or remain silent, in which case
they waive the issue on appeal, see United States v. Tejeda, 974

F.2d 210, 215 (1st Cir. 1992).

-22-

Moreno, with regard to charges that he illegally possessed a

loaded sawed-off shotgun. This is claimed to be evidence

unrelated to Moreno's character or propensity to commit crime and

thus admissible for nebulous "other purposes." Fed. R. Evid.

404(b).

This is clearly improper use of Rule 404(b). The evidence

was not even proof of wrongful acts by Moreno, but, at best,

evidence of other wrongful acts by third persons in Moreno's

presence. Because Rule 404(b) should only be invoked when

prosecutors seek to introduce evidence of prior bad acts

committed by the defendant, it is error to analyze this evidence

under that rule. United States v. Moccia, 681 F.2d 61, 63 (1st

Cir. 1982) (Breyer, C.J.) (Rule 404(b) forbids prosecution from

"asking the jury to infer from the fact that the defendant has

committed a bad act in the past, that he has a bad character and

therefore is more likely to have committed the bad act now

charged") (emphasis added). The proper inquiry is whether the

evidence is relevant, and whether it is more prejudicial than

probative. The correct answer to the first question is no, and

the answer to the second is yes.

At best the evidence shows mere presence during the

commission of other crimes by other persons. It asks the jury to

conclude that appellant somehow was guilty of that crime, and by

extension, guilty of the current crime. Appellant's mere

presence at the scene of that crime, of course, does not

establish appellant's guilt of that crime. See United States v.

-23-

Aponte-Su rez, 905 F.2d 483, 491 (1st Cir.) (mere presence at the

scene of a crime and knowledge that a crime was to be committed

is not proof of guilt), cert. denied, 498 U.S. 990 (1990); see

also Nye & Nissen v. United States, 336 U.S. 613, 619 (1949).

Furthermore, and with all due respect, concluding that persons

present at the scene of a shooting, and thereafter fleeing, are

more likely to be carrying weapons is highly illogical. It is

just as likely that persons fleeing the scene of a shooting will

be either unarmed victims or by-standers, and in fact, it is more

probable that they would have more of an incentive to flee, and

faster, precisely because they were unarmed. Thus, the inference

that it is more likely that appellant is guilty of the felon-in-

possession crime because he was fleeing from the scene of another

crime committed by other persons is insupportable. The evidence

is constitutionally and factually irrelevant.

Even if the evidence was relevant, its probative value pales

in comparison to its prejudicial effect. Any probative value

that the evidence may have stems from extended inferences and

speculation about the probabilities of people carrying weapons.

Inferences and speculation, however, are infected too easily in

this case by the transference of guilt from the shooting of a gun

by a third party to the charged crime of possession, ensuring

that a jury will draw all doubt against appellant. See United

States v. St. Michael's Credit Union, 880 F.2d 579, 602 (1st Cir.

1989) (danger that jury might convict defendant on theory of

guilt by association). When added to the impact of the

-24-

prosecutor's improper argument concerning senseless killings and

community violence, the prejudicial impact becomes manifest. The

majority opinion chooses to ignore the prejudicial effect of this

evidence, concluding that the defense somehow waived any

consideration of the issue.

Lastly, let us return to the trial itself, and consider the

overall impact of these breaches. I have already conceded that

even without the Rule 404(b) evidence, appellant probably would

not withstand a Rule 29 motion. The evidence concerning the

cylindrical object and the shotgun is perfectly valid, and one

can conclude that the charged possession of a shotgun in fact

occurred from it. The conclusion can only be reached through

extended inferences, though, because no witness testified that

they actually saw Moreno with the weapon, but only that he passed

something to someone who was later found nearby the weapon.

Given the prejudice already infused into the trial by the

improper argument and evidence, I do not see how it can be

discounted that the required inferences supporting this

conclusion were not themselves infected. In all likelihood this

prejudice would make the jury more predisposed to draw the

required inferences against appellant, thus tipping the balance

against him.

What we have here is a vulnerable case requiring the jury to

make substantial inferences in order to convict. The prosecution

beefed up its case by clearly improper statements at crucial

stages of the trial, and threw in pseudo 404(b) evidence for good

-25-

measure. Although the defendant did not create this situation,

he is asked to assume all the risks it generates. Somehow this

is not my idea of a fair trial. It contradicts all logic and

practical experience. It is past due that this court send a

clear message regarding the standards that are expected of a

litigator whose motto is that "[t]he United States wins its point

whenever justice is done its citizens in the courts." It is

better that this message be given in this case than in a case of

more societal consequence.

This appellant did not get a just trial. A new one should

be ordered.

-26-